**SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellee,**

v.

**Edward E. HOLSCHUH,
Defendant-Appellant.**

**No. 80–1166.**

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 12, 1980.

Decided Nov. 23, 1982.

plan to raise funds for the corporation by having a third-party broker form and sell interests in limited partnerships which would invest in the corporation's coal mining venture on the expectation of receiving highly profitable returns out of reciprocal lease arrangements between the corporation and the partnership. We hold: (1) that the exemption from registration liability afforded by subsection 4(1) of the Securities Act is inapplicable to this case because the transaction in question involved a distribution of new securities by an "issuer"; (2) that since the defendant was a "necessary participant" and "substantial factor" in the sale of the unregistered partnership interests, he was properly held primarily liable for those violations, notwithstanding the fact that he had no actual contact with the offerees; (3) that in ascertaining the existence of a scheme to defraud investors, the district court did not err in taking cognizance of defendant's post-sale misrepresentations which related back to his earlier deceptive statements; and (4) that the defendant acted with the degree of scienter necessary to find him liable for the antifraud violations. We affirm the award of a permanent injunction because a reasonable likelihood of future violations by the defendant has been shown.

Edward E. Holschuh, pro se.

Linda D. Fienberg, S.E.C., Washington, D.C., for plaintiff-appellee.

Before PELL, Circuit Judge, FAIRCHILD, Senior Circuit Judge, and BROWN,* Senior District Judge.

FAIRCHILD, Senior Circuit Judge.

This is an appeal from a judgment permanently enjoining defendant Holschuh, a former corporation president, from committing future violations of the registration and antifraud provisions of the federal securities laws. The action arose out of a

* Senior District Judge Wesley E. Brown of the District of Kansas sitting by designation.

## I. The Facts

After trial, the district court made detailed findings of fact. Their substance is reflected in the following narrative.

### A. Incorporation of PCR

In October 1976, Pocahontas Coal Reserves (PCR), a West Virginia corporation, was formed by Edward E. Holschuh, Dominick E. Bartone, and Harold Franklin for the purpose of securing and developing coal leases in that state. Mr. Holschuh had previously worked in the insurance business and had been part of several securities related enterprises.[1] In the summer of 1976,

1. For example, Mr. Holschuh had been involved in the formation of one company, called Midwestern Corporation, which sold to the

he was introduced by Mr. Franklin, whom he had known since 1974, to Mr. Bartone, who controlled a company called Coal Reserves for which Mr. Franklin then worked. Immediately prior to the introduction, Mr. Franklin told Mr. Holschuh that Mr. Bartone had served time in jail for either tax law violations or gunrunning. At the initial meeting, Mr. Holschuh was informed that Mr. Bartone had coal leases on property in West Virginia that he was interested in developing, and for that purpose the three decided to organize PCR. It was made clear to Mr. Holschuh that Mr. Bartone did not want his name associated with the new corporation, nor did he wish to be an officer or directly to own any of the stock. Mr. Holschuh learned, either then or in the fall of that year, that Mr. Bartone's reticence was due, at least in part, to his connection with the failure of an Ohio bank, which led in October, 1976 to his indictment for fraud.

In September or October 1976, Mr. Holschuh traveled to West Virginia to retain a law firm to prepare and file the necessary papers for creating PCR. Following incorporation on October 12, 1976, Mr. Holschuh, Mr. Bartone, and Mr. Franklin met to discuss the designation of officers and distribution of shares. It was decided that Mr. Holschuh would be PCR's president,[2] Mr. Franklin its vice-president, and Ms. Shirley Dixon, its secretary-treasurer.[3] Mr. Bartone was not made an officer, but was to have the status of a general manager, overseeing any mining operations. Mr. Holschuh was to receive 20% of the PCR stock and the remaining 80% was to be issued to Joseph Russo, a front-man for Mr. Bartone. Mr. Holschuh, Mr. Franklin, Ms. Dixon, Mr. Russo, and three former acquaintances or business associates of Mr. Holschuh served on the PCR board of directors.

Among the possibilities considered by Mr. Holschuh, Mr. Bartone, and Mr. Franklin for securing the funds necessary to develop the coal properties was the formation of a limited partnership in which interests would be sold to outside investors. Mr. Holschuh had experience in this type of financing,[4] but he determined that there was insufficient time for PCR to mount such an effort on its own before the effective date of the Tax Reform Act of 1976, because PCR had neither a sales force nor a ready pool of customers. On January 1, 1977, the new Act would substantially reduce the tax advantages of such investments, and thus Mr. Holschuh decided that it was necessary to secure the services of an established broker-dealer, experienced in promoting tax shelters. This need was met when Mr. Holschuh was introduced to Buddy C. Stanley.

### B. Formation Of The Limited Partnerships

Mr. Stanley was an officer and controlling person of Asset Management, an Indiana corporation which he had formed in 1973 to provide investment services to his customers. Asset Management had two wholly owned subsidiary corporations, Asset Development, which was set up by Mr. Stanley to serve as a general partner and management company for limited partnership ventures, and Asset Securities, a broker-dealer registered with the SEC and the state of Indiana.

In October or November 1976, Mr. Holschuh was introduced to Mr. Stanley by an old friend. Mr. Holschuh informed Mr. Stanley that PCR had coal leases in West Virginia that required further financing to develop. Mr. Stanley indicated that some of his customers might be interested in investing in such a venture, and the two discussed the possibility of forming at least one limited partnership.

---

public $18 million in securities of newly-formed companies during a two-year period, and of another company, called First Iowa Securities Corporation, which sold to the public limited partnership interests in real estate ventures.

**2.** Mr. Holschuh's duties included, among other things, selecting a board of directors, securing

coal leases and the financing to develop them, and obtaining the necessary mining permits.

**3.** Mr. Holschuh, Mr. Franklin, and Ms. Dixon held these positions until at least October, 1977.

**4.** *See* note 1, supra.

Three or more additional meetings were held between Mr. Holschuh and Mr. Stanley before the end of December 1976, for the purpose of formalizing the details of the venture and discussing the coal properties which PCR purportedly had available. Also in attendance on these occasions were Mr. Franklin and Richard D. Hodgin, an attorney employed by Asset Development. During the course of the meetings, Mr. Holschuh and Mr. Franklin were introduced as the president and vice-president of PCR and at no time was Mr. Bartone's name or relationship to PCR mentioned.

At the meetings, Mr. Holschuh told Mr. Stanley that PCR had coal leases on two pieces of property in West Virginia, referred to as the Twohig and Patterson properties, for which it needed $200,000 to commence mining operations. He also said that PCR had two other West Virginia parcels available, known as the McGrew property and the Sun Mine, and that another parcel was going to be leased from the Georgia-Pacific Corporation. After discussions concerning these properties, it was decided that Mr. Stanley would form five limited partnerships, each of which would invest $100,000 in the venture.[5] Mr. Holschuh testified at trial that he told Mr. Stanley that the monies raised by the sale of the partnership interests would be used to develop the coal properties. He agreed with Mr. Stanley that PCR would lease to each partnership an interest in coal producing property and that PCR or an affiliate would be responsible for actually mining the coal. It was further determined that the investors could expect at least a $400,000 return on each $100,000 investment over a four-year period.

For the purpose of implementing the mining ventures, Mr. Holschuh formed Pocahontas Coal Processors (PCP), a wholly owned subsidiary corporation of PCR. Each partnership was to sublease to PCP the properties it had leased from PCR. PCP would secure the necessary mining permits, contract out work, oversee the actual coal mining, and make royalty payments to the partnerships on at least a specified tonnage of coal each year. The partnerships' profits would be determined by the extent to which the royalty payments from PCP exceeded their lease payments to PCR, figured at $1.00 per ton on at least 100,000 tons for each partnership for four years.

On December 21, 1976, Mr. Stanley, a former associate of his named David Kimball, and Asset Securities began soliciting investors, primarily through mail distribution of an offering circular prepared by Mr. Hodgin. Although Mr. Holschuh had no direct part in writing the circular and did not read it prior to distribution, the district court expressly found that much of the information contained therein was directly traceable to his conversations with Mr. Stanley.[6] Among other things, the circular informed potential investors that the purpose of the partnerships would be to lease from PCR the mining rights to certain West Virginia properties; that PCR represented that it had title to the properties and the right to mine the coal therefrom; that the subsidiary, PCP, was to be primarily responsible for the mining and sale of the coal; and that investors could anticipate at least a 400% return on their investments over a period of four years. Attached to the circulars were copies of the proposed lease agreement.

On December 28, 1978, while the solicitation of investors was still underway, Mr. Holschuh and Mr. Stanley met to finalize the details of the transaction. During that meeting the partnerships were actually formed. Mr. Holschuh signed the leases between PCR, PCP, and the five limited partnerships, which granted interests in the

5. The actual sales price of the total interests in each partnership was $120,000. Of that, $100,000 was to go to PCR, $19,200 represented an initial management fee to Asset Management (for brokerage and legal fees, etc.), and $800 was to be retained as a working capital reserve.

6. When asked by this court at oral argument whether the circulars were "consistent with representations Holschuh made to Stanley," counsel for appellant responded, "Yes, that is probably a fair statement."

Georgia-Pacific property, the McGrew property, and the Sun Mine.[7] The terms of the lease agreements were essentially identical to those proposed in the attachments to the offering circulars and represented that PCR had title to the leaseholds assigned to the partnerships. The trial court found, however, that as of December 28, 1976, PCR had no leasable interest in any of the properties. Although it had an option to lease the Georgia-Pacific property, that right was not exercised until after January 1, 1977, and even then the property could not be subleased without first securing Georgia-Pacific's approval, which in fact was not obtained until March 1977. As to the McGrew property, PCR held an option to purchase, but no purchase was made until February 1977. And with respect to the Sun Mine, Mr. Holschuh testified at trial that PCR never had obtained any option or interest therein.

The solicitation of investors ended on December 30, 1976, by which time the five partnerships had been fully funded. Interests had been sold to 59 investors, only one of whom had any experience in coal related ventures. The interests were never registered with the SEC.

Of the money raised by the solicitation, PCR received $200,000 in the form of an advance from the partnerships on December 28, 1976. The following day, Mr. Bartone attended and dominated a meeting of PCR's officers and decided how a major portion of the $200,000 would be spent. He would receive $100,000, Mr. Holschuh $25,000, Mr. Franklin $25,000, and Ms. Dixon $15,000. Thus, only one day after PCR had received the money, and at a time when solicitation was continuing and the participants were still uncertain whether the additional $300,000 would be forthcoming, $165,000 had already been committed for purposes other than mining operations, and only $35,000 remained.

7. Under the terms of the offering circulars, each of the five partnerships agreed to lease as yet undetermined portions of the West Virginia properties from PCR. Mr. Holschuh and Mr. Stanley decided at the December 28, 1976, meeting that only interests in the Georgia-Pa-

*C. Post-Solicitation Activities*

The trial court found that from this time on through the receipt and virtual dissipation of the entire $500,000 by May 1977, Mr. Holschuh was well aware that many of the expenditures of PCR were made for non-mining related activities. For example, on January 3, 1977, Ms. Dixon expressed her extreme concern to Mr. Holschuh about five checks totaling $46,000 which Mr. Bartone had directed her to draw on PCR's accounts. Several of these checks represented payments to personal acquaintances of Mr. Bartone or to unrelated businesses owned in whole or in part by him. Mr. Holschuh knew that none of these payments were coal related.

At the meeting on December 28, 1976, Mr. Stanley had requested Mr. Holschuh to keep him apprised of PCR's progress concerning the commencement of mining operations, so that he could communicate that information to the limited partners. When they met in February 1977, Mr. Holschuh told Mr. Stanley that mining permits—which were a prerequisite to extracting coal from the land—had already been granted in connection with the Georgia-Pacific property and that applications were then pending regarding permits for the McGrew property and Sun Mine. This information was passed by Mr. Stanley to the investors. In truth, however, no applications had been or ever subsequently were filed concerning the Sun Mine or McGrew property, and the application for a permit to mine the Georgia-Pacific parcel was not made until March 1977, nor granted until December 1977.

Additionally, three handwritten notes received by Mr. Stanley from Mr. Holschuh in February and March of 1977 failed to draw an accurate picture of the mining venture's lack of progress and served only to lull Mr. Stanley and the investors into believing

cific, Sun Mine, and McGrew properties would be leased, presumably because core drilling samples taken from the Twohig and Patterson properties in mid-December indicated insufficient coal reserves to warrant mining.

that mining operations were progressing almost as expected. The letters disclosed neither the true situation concerning the title and ownership of the properties, nor the actual status of permit applications, nor the continued and severe depletion of the investors' funds. Similarly, the true state of affairs was not bared when, during the latter part of March 1977, Mr. Holschuh gave Mr. Stanley and Mr. Kimball a tour of the Sun Mine and the Georgia-Pacific properties. Other groundless assurances of the start of mining operations were made during subsequent months, including those contained in a report sent by Mr. Holschuh to Mr. Stanley on July 25, 1977. No mining was ever commenced on any of the land.

## II. Proceedings In The District Court

On January 16, 1978, the SEC commenced this enforcement action in the district court, seeking injunctive and other equitable relief against Mr. Holschuh, Mr. Bartone, Mr. Franklin, Ms. Dixon, Mr. Stanley, Mr. Kimball, PCR, PCP, and the various Asset companies. The Commission alleged that defendants had violated the registration and antifraud provisions of the federal securities laws and that unless enjoined were likely to commit similar violations in the future. All of the defendants, except Mr. Holschuh, consented to final orders against them. Mr. Holschuh proceeded to trial

without a jury, during the course of which he testified in his own behalf. The district court, setting forth extensive findings of fact and conclusions of law, found Mr. Holschuh primarily and secondarily liable for both the registration and antifraud violations and permanently enjoined such conduct.

## III. The Challenged Findings of Fact

On appeal, Mr. Holschuh first challenges three groups of findings of fact, although his brief makes clear that he is challenging only portions of them. He describes the portions challenged as follows: those in the first group "state that the Appellant represented to Stanley that PCR had interests in certain coal properties and could transfer leasehold interests to the partnerships"; those in the second "state that the Appellant misrepresented that he and Franklin were the principals of PCR when in reality Dominick Bartone was the 80% stockholder"; and those in the third "state that Holschuh told Stanley that the money was needed to finance the coal mining operations." Mr. Holschuh argues that all of these findings are without basis in the evidence.[8]

We have examined the trial transcript and find no merit to appellant's contentions. The first group of findings is

8. Mr. Holschuh's brief on appeal failed to include any statement of the facts as part of its statement of the case. In an attempt to excuse this failure, the brief asserts that "there are no facts in the entire record to support the district court's finding and conclusions" and that "[s]ince none of these facts are present ..., it is impossible to make reference to the record." We find this position factually incorrect for, as our discussion, *infra*, indicates, there is clear evidentiary support for the trial court's findings. More importantly, appellant misapprehends the nature of the responsibility here in question. Under Fed.R.App.Proc. 28(a)(3), the party taking an appeal is required to present in its brief, under an appropriate heading, in the order indicated, and with reference to the record, a "statement of the facts relevant to the issues presented for review." *See U.S.C.S. Rules of Court, at 163–164; see also* 7th Cir.R. 9(C), *reprinted in id.*, (Supp.1980), at 148. This is not merely an obligation to present factual support for the trial court's decision (though

where such exists counsel is ethically bound to call it to the attention of the court, *see generally* ABA Model Code of Prof.Resp. (1980), EC 7–19 and 7–27), but extends to generally illuminating the context out of which the issue arises. While on occasion there may be no factual support for the findings of the district court, it is difficult to imagine a case in which there would be no facts relevant to the issues raised for appellate review. An appellant's responsibility to muster the facts is not one to be taken lightly; unless properly performed an unwarranted burden is imposed on the limited resources of the appellate court and, indeed, fair resolution of the case may be jeopardized. Although Mr. Holschuh's main and reply briefs were labelled *pro se,* his counsel at oral argument acknowledged that their preparation had been "aided and abetted" by professional legal assistance. We think it clear that they should have contained at least some statement of the facts.

amply supported by Mr. Stanley's testimony that Mr. Holschuh said during the course of the meetings that PCR "had valuable coal leases ... in West Virginia, that [it] wanted to mine," and that on December 28, 1976, he told Mr. Stanley that PCR had title to the Georgia-Pacific property and signed the partnership leases which represented that PCR held title to the real estate. The second group of disputed findings draws evidentiary support from Mr. Stanley's testimony that Mr. Holschuh and Mr. Franklin said that they owned all of PCR's stock. And, as to the final group of findings, it suffices to say that when asked on the witness stand whether he told Mr. Stanley "that the money raised would be used to develop coal properties," Mr. Holschuh himself replied "Yes .... That we needed the money for coal mining operations, yes."

While other testimony in the record might have supported different findings, determination of credibility was the province of the district court. The court indicated its basis for discrediting Mr. Holschuh's testimony when it observed that Mr. Holschuh had displayed a "lack of candor with the Government and the Court." We are satisfied that the findings of fact were not clearly erroneous.

### IV. Violation of the Registration Provisions

Section 5(a)[9] of the Securities Act of 1933 (1933 Act) provides, in relevant part, that unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly, to sell

the security through the use of any means or instrument of transportation or communication in interstate commerce or the mails. Subsection 5(c) makes a similar provision as to an offer to sell unless a registration statement has been filed.

There is no dispute that the limited partnership interests constituted securities, *see, e.g., Goodman v. Epstein,* 582 F.2d 388, 406–09 (7th Cir.1978); *Securities & Exchange Commission v. Murphy,* 626 F.2d 633, 640 (9th Cir.1980), that they were not registered with the SEC, and that the mails and interstate commerce were involved in their offer and sale. Mr. Holschuh has not challenged on appeal the findings that the securities were not exempt from registration under the interstate offering or private placement exceptions.[10]

Mr. Holschuh contends that he was not an issuer of the securities and therefore could not have violated Section 5 because of the provisions of Subsection 4(1).[11] That subsection provides that Section 5 shall not apply to "transactions by any persons other than an issuer, underwriter, or dealer."

This line of argument is unacceptable because it is premised upon an erroneous interpretation of the statute. Section 4(1) provides an exemption for transactions, not individuals. *See Murphy, supra,* 626 F.2d at 648; *United States v. Wolfson,* 405 F.2d 779, 782 (2d Cir.1968), *cert. denied,* 394 U.S. 946, 89 S.Ct. 1275, 22 L.Ed.2d 479 (1969). It was created to exempt routine trading transactions with re-

---

**9.** 15 U.S.C. § 77e(a).

**10.** Mr. Holschuh does, however, claim—bearing presumably upon some question of good faith or intent—that prior to the offering and sale he "never knew or had any reason to suspect that a 'public offering' was to be made" and that, in fact, he "intended private placement of the limited partnership interests." This contention is transparent. Having misrepresented material facts that he knew Mr. Stanley would use in soliciting investors, Mr. Holschuh, as a man experienced in securities transactions, could not have concluded in good faith that even sophisticated investors would have had access to the type of information that

would have been disclosed by a proper registration statement. *See Securities and Exchange Commission v. Ralston Purina Co.,* 346 U.S. 119, 125–126, 73 S.Ct. 981, 984–85, 97 L.Ed. 1494 (1953). In addition, good faith is not relevant to whether there has been a primary violation of the registration requirements, *cf. Securities and Exchange Commission v. Guild Films Co.,* 279 F.2d 485, 490 (2d Cir.1960), and, assuming without deciding that it might somehow bear upon secondary liability as an aider and abettor, we do not reach that question in the instant case.

**11.** 15 U.S.C. § 77d(1).

**138**

spect to securities already issued and not to exempt distributions by issuers or acts of others who engage in steps necessary to such distributions. *See Murphy, supra,* 626 F.2d at 648; *Securities and Exchange Commission v. Van Horn,* 371 F.2d 181, 188 (7th Cir.1966); *Securities and Exchange Commission v. Culpepper,* 270 F.2d 241, 247 (2d Cir.1959); *Securities and Exchange Commission v. Chinese Consol. Benev. Ass'n, Inc.,* 120 F.2d 738, 741 (2d Cir.1941); *see also* Preliminary Note to Rule 144, 17 C.F.R. § 230.144 (1979). Thus, even assuming that a particular defendant is not an issuer, underwriter, or dealer, he is not protected by Section 4(1) if the offer or sale of unregistered securities in question was part of a transaction by someone who was an issuer, underwriter, or dealer.

■ Accordingly, whether PCR or each partnership or general partner is the issuer, the sales were transactions by an issuer or underwriter, and were violations of Section 5.

The critical question for the purpose of this case is whether Mr. Holschuh's activity bearing upon the sales is sufficiently significant to hold him responsible for them. He would cast the partnerships as the issuers, and presumably would characterize PCR as a borrower from the partnerships, giving each partnership a lease and taking a lease back, the difference in royalties being the means of repayment as well as security therefore. The picture is unrealistic, because the investors were putting their money into PCR, and their hope for return depended exclusively on the success of PCR. The partnerships were not to perform any business activity. Their formation and the creation of limited partnerships were only a

device for dividing a right to expected profits of PCR into units of marketable size, accompanied by a tax advantage.

■ When the securities are so viewed PCR would be the issuer. That view seems to us to be consistent with broad construction to effectuate the remedial purposes of the statute. *United States v. Naftalin,* 441 U.S. 768, 773, 99 S.Ct. 2077, 2081, 60 L.Ed.2d 624 (1979).[12]

In *Murphy, supra,* 626 F.2d 633, the facts of which are discussed later in this opinion, the court considered the question of who is an issuer of partnership shares. Recognizing that the overriding purpose of the federal securities laws is to provide investors with information material to their investment decisions and that the history of a limited partnership is of little value where it has been recently formed by and is intertwined with another business entity, the court held that: "When a person organizes or sponsors the organization of limited partnerships and is primarily responsible for the success or failure of the venture for which the partnership is formed, he will be considered an issuer for the purposes of determining the availability of the private offering exemption." Id. at 644.

In the present case, PCR was the corporate entity fundamentally responsible for the formation of the five limited partnerships. Its officers conceived of the coal mining venture, decided how funding should be obtained, and promoted and saw to fruition, albeit with the invited assistance of Mr. Stanley and his Asset companies, the offer and sale of the partnership interests. The reciprocal leases executed between PCR, the limited partnerships, and

12. While the Supreme Court has warned that "generalized references to 'remedial purposes' of the 1934 Act will not justify reading a provision more broadly than its language and statutory scheme reasonably permit," *Touche Ross & Co. v. Redington,* 442 U.S. 560, 578, 99 S.Ct. 2479, 2490, 61 L.Ed.2d 82 (1979) (quoting *SEC v. Sloan,* 436 U.S. 103, 116, 98 S.Ct. 1702, 1710, 56 L.Ed.2d 148 (1978)), a provision must be given as expansive a meaning as the terms and the legislative intent warrant. In *Touche Ross* the Court refused to read into a statute rights

of action that were neither expressly provided for nor intended by Congress. 442 U.S. at 568–76, 99 S.Ct. at 2485–89. Here we merely give practical meaning to the term "issuer" consistent with its use in Subsection 4(1). Our liberal reading is in keeping with Congress' expressed intent to have the terms of the Act broadly defined and to protect the investing public. *Cf. United States v. Naftalin,* 441 U.S. 768, 772–77, 99 S.Ct. 2077, 2081–84, 60 L.Ed.2d 624 (1979).

PCP (which were not unlike the sell-and-lease-back arrangements involved in *Murphy, see infra* at pp. 139–140) created a relationship of interdependence such that the financial success of the limited partnerships hinged upon the continued viability and performance of PCR and its wholly owned subsidiary, PCP. As the trial court found: "The partners were looking to the efforts of Holschuh, PCR, and PCP for the exploration and development of the leases. The exploration and marketing aspect of this enterprise was inextricably interwoven into the limited partnership interests in both an economic and legal sense."

Clearly, the key to the limited partnerships' success or failure rested in the hands of PCR and, therefore, it was the entity concerning which prospective investors needed information.

■ As a matter of form, each partnership, or perhaps its general partner, might be considered the issuer of the limited partnerships as securities. *See Murphy, supra,* 626 F.2d at 642. If so viewed, the relationship between Holschuh and the sales by the issuer are a little less closely related, perhaps, than if the issuer is PCR. In either case, however, we consider Holschuh to have been so substantial a participant, indeed a prime mover, in the sales as to be liable for their unlawfulness, in terms of nonregistration, and fraud as well.[13]

The doctrine of participant liability has evolved in enforcement actions brought by the SEC to enjoin future violations of section 5. Defendants have been held liable where they have been a "necessary participant" and "substantial factor" in the offer and sale of unregistered securities. *See*

*Van Horn, supra,* 371 F.2d at 188, *Culpepper, supra,* 270 F.2d at 247; *Chinese Consol. Benev. Ass'n, supra,* 120 F.2d at 741; *see generally Murphy, supra,* 626 F.2d at 650–52. *Murphy,* is a recent decision of special significance because it involves facts and issues in many respects similar to those found in the present dispute.

In that case, the defendant, Stephen Murphy, had formed a California corporation called Intertie, which was in the business of financing, constructing, and managing cable television systems. At various times, he served as one of its directors and as its vice-president, president, or chairman of the board. Intertie's operations involved the promotion of several limited partnerships, and often employed a sell-and-lease-back financing scheme designed by Mr. Murphy. In the usual case, Intertie would purchase a cable television system, sell the system to a limited partnership it had organized, and then lease the system back. The profitability of the limited partnership hinged upon its leasing arrangement with Intertie and Intertie's continued operation of the cable system. To handle the sale of limited partnership interests, Intertie engaged the services of a securities brokerage firm (ISC), whose salesmen would contact potential investors. Frequently, ISC representatives would serve as general partners in the ventures. Mr. Murphy played an active role in promoting sales of the partnership interests by writing or reviewing the offering circulars and sales brochures and by meeting with ISC salesmen and prospective buyers. None of the interests offered or sold were ever registered with the SEC. Eventually, Intertie was unable to keep up with its debt obligations and Mr. Murphy, as its president, filed for corporate bankruptcy.

---

13. The district court found that Mr. Holschuh was primarily liable under section 5 because, like PCR, he was an "issuer" of the unregistered securities. The Commission urges on appeal that liability could also have been imposed by reason of the fact that Mr. Holschuh was a "controlling person" and an "underwriter." A prior decision of this circuit, *Securities and Exchange Commission v. Van Horn,* 371 F.2d 181, 188 (7th Cir.1966), suggests that the term "underwriter" is broad enough to encompass all persons who engage in steps necessary to the distribution of securities. We find it unnecessary to resolve these terminological conundrums because we think that the fact Mr. Holschuh was president of PCR and thoroughly involved in the relevant activities leading to the offer and sale is sufficient to establish participant liability on his part.

In an action by the Commission to enjoin Mr. Murphy from committing future violations of the federal securities laws, the court concluded that he would be held primarily liable for the registration violations.[14] In view of the fact that Mr. Murphy had devised the financing scheme without which there would have been no limited partnerships, had prepared or reviewed the offering materials, had met with potential investors, and had spoken at broker-dealer sales seminars, he had clearly been a necessary and substantial factor in the sales of the unregistered securities. A permanent injunction was issued.

The facts in the present case show that Mr. Holschuh was extensively involved in the formation of PCR, PCP, and the five limited partnerships, and in the issuance of the new securities. Initially, he made the formal arrangements for incorporating PCR, and thereafter served as its president at all times relevant to this appeal. As a person with experience in the securities field, he played a main role in the development of PCR's fund raising agenda, and it was he who decided that it was necessary to secure the services of an experienced broker. Through Mr. Holschuh's efforts Mr. Stanley and his Asset companies were contacted. At the series of meetings, at which he was the primary representative of PCR, it was agreed, among other things, that the limited partnerships would be organized, that interests therein would be sold to investors by the Asset companies, and that the actual mining operations would be done by PCR's subsidiary, PCP. Mr. Holschuh was present at the December 28th meeting at which the limited partnerships were actually created and, indeed, it was he who,

on behalf of PCR and PCP, signed the reciprocal leases which represented the partnerships' *raison d'etre.*

In short, the evidence shows that Mr. Holschuh's actions, far from being unwitting or *de minimis,* had intimately involved him in the details of numerous stages of a greater plan, of which he had in fact been a designer, and which he knew was calculated toward a hurried issuance of new securities. We conclude that the facts here are more than sufficient to show that Mr. Holschuh was a "necessary participant" and "substantial factor" in the unlawful sales transactions, and therefore satisfy the test for primary liability applicable to enforcement actions seeking injunctive relief.

In reaching this determination, we reject appellant's contention that primary liability may not be imposed absent some showing of direct contact between himself and the offerees. Admittedly, evidence of greater participation in the solicitation campaign was present in *Murphy,* but we find no indication that the court regarded that factor as essential to its disposition of the case. Rather, the relevant inquiry in an enforcement action is whether the evidence shows that the defendant was a substantial and necessary participant in the sales transactions. To hold that proof of direct contact is necessary would be to ignore and render meaningless the language of section 5, which prohibits any person from "directly *or indirectly*" engaging in the offer or sale of unregistered securities, and would encourage violators to attempt to avoid liability by participating in all except the final steps of a planned offering (emphasis added).[15] We see no reason to follow such a course.[16]

---

**14.** The court found it unnecessary to decide whether to apply the "necessary and substantial participant" test or a slightly different standard that has emerged in rescission actions premised on violations of section 5, because Mr. Murphy was clearly liable under either. 626 F.2d at 652. We have no difficulty concluding that the former is the rule applicable to the present case.

**15.** Even if it were possible to circumvent primary liability in this manner, however, secondary liability would often attach under the theory of aiding and abetting. We note that the

viability of both the "aider and abettor" and "participant" theories has been questioned in dicta by the Ninth Circuit "in light of recent Supreme Court cases that prescribe a strict statutory construction approach to the securities acts," but that court has not directly confronted the issue. *Securities and Exchange Commission v. Seaboard Corp.,* 677 F.2d 1289, 1294 n. 4 (9th Cir.1982); *Securities and Exchange Commission v. Seaboard Corp.,* (cited by Ninth Circuit as *Admiralty Fund v. Hugh Johnson & Co.),* 677 F.2d 1301, 1311 n. 12 (9th

*Securities and Exchange Commission v. Coffey,* 493 F.2d 1304 (6th Cir.1974), upon which appellant heavily relies, does not, in our view, require a contrary result. There, a corporation had sold various notes to the state of Ohio after satisfying a pre-condition of obtaining a "prime" rating from a credit organization (NCO). When the company financially collapsed, the Commission charged that fraud by deceptive omission had been committed in obtaining the favorable rating from NCO and in negotiating with the state. It sought to enjoin, among others, Mr. King, the board chairman, and Mr. Coffey, the financial vice-president, from committing future antifraud violations.

Upon reviewing the evidence, the court found that neither Mr. King nor Mr. Coffey had any contact with the officials negotiating for the state of Ohio, and that Mr. King had no contact with NCO representatives. It therefore held that neither defendant, as to the Ohio transaction, nor Mr. King, as to the NCO transaction, could be found primarily liable for omissions of material fact.[17] The court observed:

"[O]nly those individuals who had an affirmative obligation to reveal what was allegedly omitted can be held as primary participants in the alleged deception. A

Cir.1982). *Cf.* Fischel, *Secondary Liability Under Section 10(b) of the Securities Act of 1934,* 69 Cal.L.Rev. 80 (1981). Whether the Ninth Circuit correctly states the standard for interpreting the provisions of the securities acts after *Touche Ross & Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), which was a case concerned only with the question of implying a right of action under the 1934 Act, we cannot accept the suggestion that a strict reading of the terms of section 5 prevents us from reaching the person responsible for orchestrating the issuance of the securities and making the related misrepresentations simply because he stopped short of direct contact with the investors.

16. In the analogous contexts of suspension proceedings or private rescission actions, commenced as a result of alleged violations of the registration requirements, courts have likewise held that the absence of direct contact between a broker and ultimate purchaser is in no sense determinative of a broker's status as "seller."

duty to disclose naturally devolved on those who had direct contacts with 'the other side.' ...

"... We refuse to impose such a duty ... on persons not in a special relationship with a buyer or seller of securities."

493 F.2d at 1315 (footnote omitted).

Mr. Holschuh's assertion that the above language requires some type of actual or first-hand contact with prospective offerees clearly goes further than the *Coffey* court intended. In a footnote to the second sentence quoted above—to which appellant makes no reference—the court said: "Direct contacts may take many forms. An accountant or lawyer, for instance, who prepares a dishonest statement is a primary participant in a violation even though someone else may conduct the personal negotiations with a securities purchaser." 493 F.2d at 1315 n. 24 (citations omitted). This statement leaves no doubt that the Sixth Circuit did not consider actual contact with "the other side" an indispensable prerequisite to primary liability. Its holding is explained by the fact that in addition to the lack of direct contact neither defendant had been significantly involved in the events relevant to the Ohio transaction, nor had Mr. King substantially participated in the NCO transaction.[18]

*See, e.g., Wasson v. Securities and Exchange Commission,* 558 F.2d 879, 886 (8th Cir.1977).

17. The court did find, however, that because Mr. Coffey had personally sent financial information to NCO, he could potentially be held liable under Rule 10b–5(2) for omitting material facts necessary to keep the statements made to NCO from being misleading. This depended upon what Mr. Coffey knew or should have known at the time of his dealings with NCO, which questions were remanded to the district court. *See Coffey, supra,* 493 F.2d at 1314.

18. Mr. King had no direct contact with either NCO or the state of Ohio, had been given no information concerning the negotiations with those parties, and had merely been present at the executive board meetings at which the loans were approved. Mr. Coffey had no direct contact with the Ohio negotiations, his involvement being limited to his participation in the meetings which approved the loans, his signature on the notes, and his general oversight of

We conclude that Mr. Holschuh is primarily liable for violating the registration requirements, and therefore it is unnecessary for us to probe the question of whether secondary liability should also attach, for either determination by itself is a sufficient predicate for issuance of injunctive relief. *See, e.g., Securities and Exchange Commission v. Dolnick*, 501 F.2d 1279, 1283 (7th Cir.1974) (aider and abettor enjoined). Mr. Holschuh asserts error because the district court decided after finding Holschuh primarily liable that he was also secondarily liable. We view the latter proposition as an alternative, although not so stated.

## V. The Anti-Fraud Violations

The district court found that Mr. Holschuh made fraudulent misrepresentations and failed to disclose material information to Mr. Stanley and Asset Securities with full knowledge that those statements would be used to solicit investors. Accordingly, it held Mr. Holschuh primarily liable for violations of the antifraud provisions of section 17(a) of the 1933 Act,[19] section 10(b) of the Securities and Exchange Act of 1934 (1934 Act),[20] and Commission rule 10b–5.[21]

On appeal, Mr. Holschuh again relies upon the *Coffey* decision as support for the proposition that primary liability, this time for the antifraud violations, may not be imposed since he had no contact with investors nor editorial control over the contents of the offering circulars. He also asserts that the circulars in fact contained no deceptions and that the court erred by considering his post-sale "lulling activities" in making its finding of fraud and by stating that it was not necessary for the SEC to prove intent to deceive, manipulate, or defraud in an action to enjoin violation of the antifraud provisions.

 Our discussion thus far of the facts and issues leaves no doubt that Mr. Holschuh was responsible for material misstatements and omissions of fact in the information furnished to the offerees. Most notably, the circulars misrepresented that PCR held leasable interests in the West Virginia properties and failed to disclose the nature and extent of the involvement of Mr. Bartone, a person who had previously been convicted of crime and was then under indictment for bank fraud, in the ownership and affairs of PCR. As noted, evidence in the record supports the district court's finding that these misrepresentations were material to the investors' decisions and were directly traceable to Mr. Holschuh's pre-sale activities on behalf of PCR. Appellant does not dispute—nor could he with any success—that information concerning the true ownership of the West Virginia properties or Mr. Bartone's status would have been important to the offerees in making their investment decisions. That being so, the court was justified in concluding that section 17(a), section 10(b), and Rule 10b–5 had been violated.

We have already considered *Securities and Exchange Commission v. Coffey,* and have concluded that it did not make actual or first-hand contact with offerees or buyers a condition precedent to primary liability for antifraud violations and that it would not support such a requirement in the context of noncompliance with the registration provisions.

the company's financial affairs as financial vice-president. *Coffey,* 493 F.2d at 1314.

*See Securities and Exchange Commission v. Senex Corp.,* 399 F.Supp. 497 (E.D.Ky.1975), *aff'd without reaching merits,* 534 F.2d 1240 (6th Cir.1976) (per curiam), where the district court, in discussing the *Coffey* decision, stated: "Primary liability results when the participants possess an affirmative disclosure obligation by reason of a direct involvement in the subject transaction. Such participation need not be the actual sale but may include activities touching the transaction... Unlike the corporate officers' responsibility for subordinates rejected in *Coffey,* the defendants in the case at bar were ultimately [intimately?] involved in transactions commencing with the contact by the Covington mayor and culminating in the consumer bond sale." 399 F.Supp. at 507 (citation omitted, brackets added).

19. 15 U.S.C. § 77q(a).

20. 15 U.S.C. § 78j(b).

21. 17 C.F.R. 240.10b–5.

Where a defendant is personally involved in a plan or scheme to market securities to the extent that Mr. Holschuh was here, primary liability may attach to him individually, assuming that he has acted with the requisite degree of intent. In *Aaron v. Securities and Exchange Commission,* 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980), the Supreme Court held that the SEC must prove scienter, as defined in *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), in actions under sections 10(b) and 17(a)(1), but that only negligence need be shown in actions under sections 17(a)(2) or (3). At the time the district court rendered its decision, *Aaron* had not yet been decided. Following then-controlling precedent of this circuit, the district court stated that proof of intent to deceive, manipulate, or defraud was not necessary in an enforcement proceeding seeking injunctive relief. This expression, though now known to be erroneous, can be disregarded because the court went on to say unequivocally that, "[n]evertheless, the Commission has proven that Mr. Holschuh's conduct was more than mere[ly] negligent, but involved scienter within the meaning of ... *Hochfelder* ...." This statement leaves no doubt that the district court found that the standard later enunciated in *Aaron* was fulfilled. Inasmuch as that determination is supported by the record, the judgment of primary liability on the fraud charges need not be

disturbed. *See Murphy, supra,* 626 F.2d at 653–654.

Mr. Holschuh maintains that the district court erred when, in assessing the charges of fraud, it took cognizance of the fact that subsequent to formation of the partnerships he deceived the investors with respect to issuance of the mining permits, commencement of operations, title to the leased properties, and use of the investor's monies. It is his position, essentially, that a violation of the securities laws may not be based on events occurring after a sale has been completed, because such events could not have influenced the decisions of investors and cannot satisfy the statutory requirement of being "in connection with the purchase or sale of any security." [22]

Appellant's argument might have merit were it true that the district court predicated its finding of fraud solely upon Mr. Holschuh's post-sale activities. The court's detailed conclusions of law, however, make indisputably clear that its finding rested predominantly upon Mr. Holschuh's conduct prior to completion of the sale and that, to the extent it considered his later lulling activities, it did not see them as standing apart from the earlier unlawful conduct.[23] What the court said was that "[a] scheme to defraud may well include later efforts to avoid detection of the fraud." This is a correct statement of the

---

**22.** *See* section 10(b) of the 1934 Act (15 U.S.C. § 78j(b)), and Rule 10b–5 (17 C.F.R. 240.10b–5). Section 17(a) of the 1933 Act (15 U.S.C. § 77q(a)), similarly speaks of fraud "in the offer or sale of any securities." In *United States v. Naftalin,* 441 U.S. 768, 773, 99 S.Ct. 2077, 2081, 60 L.Ed.2d 624 n. 4 (1979), the Supreme Court declined to say whether "in" connoted a narrower range of activities than "in connection with," and noted that on occasion it and Congress have used the terms interchangeably.

**23.** The two relevant conclusions of law stated:

"24. The Commission has shown that Holschuh made fraudulent misrepresentations and omitted to disclose material information to Stanley and Asset Securities in connection with the leasehold interests, the mining permits, the mining operations, and the use of investor proceeds. Holschuh knowingly made these false and misleading statements to the Asset Group with full knowledge that public investors would

be solicited to purchase securities based upon those statements. Therefore, Holschuh is primarily liable for violations of Section 17(a) of the Securities Act and Section 10(b) of the Securities Exchange Act and Rule 10b–5 promulgated thereunder.

"25. The Commission has also shown that Holschuh knowingly made fraudulent misrepresentations and omitted to disclose material information to Stanley subsequent to the formation of the partnerships on December 28, 1976, in connection with mining permits, mining operations, leasehold interests, and use of investor proceeds with full knowledge that this information was being disseminated to the public investors. These communications constitute part of defendant Holschuh's illegal scheme to violate the antifraud provisions of the federal securities laws. A "scheme to defraud may well include later efforts to avoid detection of the fraud ...."

law.[24] Mr. Holschuh's conduct prior to the sale clearly satisfied the "in connection with" requirement, and his subsequent lulling activities, which the court found to be part of a single scheme or plan, simply related back to the earlier fraudulent conduct. See Hoglund v. Covington County Bank, (1977–1978 Transfer Binder] Fed.Sec. L.Rep. (CCH) ¶ 96,003 (M.D.Ala.1977).[25] The court was entitled to consider the lulling activities because they were evidence of a scheme which, viewed as a whole, was sufficiently closely connected to the sale [26] and was relevant to the question of intent. We find no error.

We conclude that the district court properly found Mr. Holschuh primarily liable for violating the antifraud provisions of the federal securities laws. That finding forms a sufficient basis for the Commission to seek an injunction against future violations. For the reasons expressed earlier in connection with the registration violations, we see no merit to appellant's objection to the district court's having found him primarily and secondarily liable for fraudulent misrepresentations made to the investors.

## VI. Injunctive Relief

 In an action for a statutory injunction,[27] once a violation has been demonstrated, the moving party need only show that there is a reasonable likelihood of future violations in order to obtain relief. See Commodity Futures Trading Commission v. Hunt, 591 F.2d 1211, 1220 (7th Cir. 1979). In predicting the likelihood of future violations, a court must assess the totality of the circumstances surrounding the defendant and his violation, including such factors as the gravity of harm caused by the offense; the extent of the defendant's participation and his degree of scienter; the isolated or recurrent nature of the infraction and the likelihood that the defendant's customary business activities might again involve him in such transactions; the defendant's recognition of his own culpability; and the sincerity of his assurances against future violations. See generally Murphy, supra, 626 F.2d at 655; Securities and Exchange Commission v. Bonastia, 614 F.2d 908, 912 (3rd Cir.1980); Hunt, supra, 591 F.2d at 1220.

 Quite simply, the facts show that Mr. Holschuh, a man of some experience in securities transactions, was a key participant in a scheme which defrauded investors of hundreds of thousands of dollars, in furtherance of which he repeatedly and intentionally misrepresented material facts that he knew would be passed to the investors. Throughout the proceedings he has failed to

---

24. This court has had occasion to state and elaborate upon this same principle:

> "A scheme to defraud may well include later efforts to avoid detection of the fraud ... Avoidance of detection and prevention of recovery of the money lost by the victims are within, and often a material part of, the illegal scheme. Further profit from the scheme to defraud, as such, may be over, and yet the scheme itself may not be ended." *United States v. Riedel,* 126 F.2d 81, 83 (7th Cir. 1942).

While the above quotation was written in reference to a mail fraud scheme, we think it fully applicable to a scheme to defraud under the securities laws.

25. In *Hoglund,* plaintiffs contended that they were defrauded when they purchased securities and that, by allegedly lulling them afterwards, a bank advanced and participated in a fraudulent scheme and incurred liability for the fraud. The district court denied a motion to reconsider its earlier decision permitting plaintiffs to go to trial against the bank, because it found that the

bank's alleged actions were sufficiently "in connection with" the sale of securities, since its lulling related back to the earlier fraudulent obtaining of the money.

26. The *Hoglund* court and the district court in the instant case both found that an analogy may be profitably drawn to decisions under the federal mail fraud statute which have held that post-purchase lulling by mail is considered part of a fraudulent scheme, even where money has changed hands before mailing occurs. *See United States v. Sampson,* 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962); *United States v. Ashdown,* 509 F.2d 793 (5th Cir.1975); *Walters v. United States,* 256 F.2d 840, 843–844 (9th Cir.1958); *United States v. Riedel,* 126 F.2d 81, 83 (7th Cir.1942).

27. The present action for injunctive relief was commenced under section 20(b) of the 1933 Act (15 U.S.C. § 77t(b)) and section 21(e) of the 1934 Act (15 U.S.C. § 78u(e)).

admit his culpability or to provide any adequate assurance against future violations, but rather has steadfastly professed his innocence of wrongdoing. By reason of his inconsistent positions at various stages of the proceedings, the court noted his lack of candor. On these facts the district court was more than justified in concluding that there was a reasonable likelihood of future registration and antifraud violations and in permanently enjoining Mr. Holschuh from committing further violations.

The judgment of the district court is AF-FIRMED.