# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued October 16, 2006          Decided November 28, 2006

No. 06-1001

IRA WEISS,
PETITIONER

v.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT

---

On Petition for Review of an Order of the
Securities and Exchange Commission

---

*David J. Hickton* argued the cause for petitioner. With him on the briefs were *Ira L. Podheiser, Richard D. Bernstein,* and *Stephen B. Kinnaird*.

*John W. Avery*, Special Counsel, Securities and Exchange Commission, argued the cause for respondent. With him on the brief were *Brian G. Cartwright*, General Counsel, *Jacob H. Stillman*, Solicitor, and *Mark Pennington*, Assistant General Counsel.

Before: HENDERSON, RANDOLPH and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* RANDOLPH.

2

RANDOLPH, *Circuit Judge*: The Securities and Exchange Commission imposed sanctions on Ira Weiss after finding that he had violated securities laws. At the time of the violations, Weiss was serving as bond counsel for a school district. The issue in Weiss's petition for judicial review is whether substantial evidence supports the SEC's decision.

I.

The Internal Revenue Code excludes interest on local government bonds from the gross income of bond purchasers. 26 U.S.C. § 103(a). This federal tax exemption makes it possible to sell municipal bonds at a lower interest rate than other bonds. It also presents issuers with arbitrage opportunities. A local government entity might be tempted to issue tax-exempt bonds with an interest rate of, say, four percent, and then invest the proceeds in Treasury bonds earning five percent. If the entity invests the proceeds in appropriately structured derivatives, such as Treasury STRIPS, it can earn an instant, risk-free profit on the transaction.

Statutory and regulatory restrictions are designed to "minimize the arbitrage benefits from investing gross proceeds of tax-exempt bonds in higher yielding investments and to remove the arbitrage incentives . . . to issue bonds earlier . . . than is otherwise reasonably necessary to accomplish the governmental purposes for which the bonds were issued." 26 C.F.R. § 1.148-0(a). An issuer's failure to abide by the restrictions renders the bonds "arbitrage bonds," the interest on which is not tax-exempt. 26 U.S.C. §§ 103(b)(2), 148.

Although investing bond proceeds in higher yielding investments normally causes the bonds to become arbitrage bonds, Treasury Department regulations contain an exception. Up to $10 million of bonds may remain tax-exempt and the issuer may retain any profits earned during a three-year

"temporary period" after the issue date if the issuer "reasonably expects" to satisfy three tests: the expenditure test, the time test, and the due diligence test. 26 C.F.R. § 1.148-2(e)(2). The expenditure test requires the issuer to spend "at least 85 percent" of the bond proceeds on "capital projects" within three years. *Id.* § 1.148-2(e)(2)(A). The time test requires that the issuer incur "within 6 months of the issue date a substantial binding obligation" to spend "at least 5 percent" of the bond proceeds on "capital projects." *Id.* § 1.148-2(e)(2)(B). The due diligence test requires that "completion of the capital projects and the allocation of the [funds] . . . to expenditures proceed with due diligence." *Id.* § 1.148-2(e)(2)(C).

Because the Treasury regulations look to whether the issuer reasonably expected to satisfy the three tests "as of the issue date," *id.* § 1.148-2(b), not to whether it actually satisfied them later, there is potential for abuse. To assuage the concerns of investors, issuers retain bond counsel to provide an unqualified legal opinion that the interest on the bonds will be exempt from federal taxation. According to the National Association of Bond Lawyers, the purpose of an unqualified bond opinion is to "assure[] investors that . . . there is no reasonable risk of . . . taxability that the investors should take into account in making an investment decision, except for risks disclosed in the opinion." Nat'l Ass'n of Bond Lawyers, STATEMENT CONCERNING STANDARD APPLIED IN RENDERING THE FEDERAL INCOME TAX PORTION OF BOND OPINIONS 4 (1993) ("NABL STATEMENT"). Because investors rely so heavily on unqualified bond opinions, bond counsel must "apply a high standard of professional conduct." *Id.* at 2. In particular, a bond opinion "should be based upon a reasonably sufficient examination of material legal and factual sources and reasonable certainty as to the subjects addressed therein." *Id.* at 9. Both parties in this case agree that the Association has articulated the applicable standard for rendering unqualified bond opinions.

4

II.

The Neshannock Township School District of Lawrence County, Pennsylvania, operates an elementary school and a junior and senior high school. In early 1999, the School District recognized that the elementary school building was in need of substantial renovations and repairs. The nine-member School Board also considered building a separate middle school for students in grades six through eight. By February 2000, the Board had compiled a "wish list" of projects, but there was no consensus among Board members about which projects should be undertaken. In April 2000, in response to the concerns of some residents about the middle school concept, the Board announced that it would hold public hearings before making any final decisions on projects.

In May 2000, L. Andrew Shupe II read in a newspaper that the School District was contemplating some capital projects. Shupe was president of Quaestor Municipal Group, Inc., an investment banking firm in the business of arranging municipal financings. Shupe called Ronald Mento, the superintendent of the School District, and arranged to make a presentation before the Board to propose a bond transaction.

Shupe also called his friend Ira Weiss, a Pittsburgh attorney, to ask if Weiss would be interested in acting as bond counsel and writing the bond opinion. Weiss had worked with Shupe on about twenty bond deals prior to the Neshannock transaction. Shupe offered Weiss the deal, but also told Weiss that he "could get it done elsewhere" if Weiss "wasn't comfortable" writing the opinion. Weiss called superintendent Mento to find out what capital projects the School District was planning. Mento told Weiss that the School District "needed [to do] some smaller projects" and was "committed to doing a larger project, renovation of the high school." After this conversation, Weiss told Shupe that he felt "comfortable . . .

writ[ing] the opinion."

On May 8, 2000, Shupe and Weiss attended a Board meeting at which Shupe proposed that the School District issue $9.6 million in three-year bonds. Shupe distributed a written proposal stating: "In current market conditions, School Districts have and are borrowing in advance of projects just to invest the proceeds for three years and legally keep the positive investment earnings." This arbitrage concept was the main topic of conversation during Shupe's presentation. Shupe's written proposal – which refers to bonds as "notes" – illustrated the concept as follows:

> A School District borrows $9.6 million for three years on a tax-exempt basis and pays an annual interest rate of 5.10%.

> The School District invests the net proceeds from the Note Issue in U.S. Treasury securities over the same three-year period and the securities yield 6.56%.

> The excess earnings, less any costs of issuance, will be available to the School District on the day of closing the Note Issue.
> (Estimated at $225,000 on June 20, 2000)

Weiss advised the Board that this concept "wasn't exactly the case." Weiss "told the School Board . . . that they had to have projects; they had to reasonably expect to proceed with them and do them within three years." Weiss said that if this was not the case, then he "shouldn't be there." Weiss never explained with any specificity two of the three tests – the time test and the due diligence test – that Treasury regulations require issuers to have a reasonable expectation of satisfying. According to Richard Flannery, the School District's lawyer, if Weiss had mentioned the time test, it "would have raised a lot of

flags" because of concerns that the Board had not reached any agreement about capital projects.

According to Board member Gina Hennon, others attending the meeting expressed "incredulity" and "skepticism" about the arbitrage opportunity and wondered whether it was "too good to be true." Weiss responded, "absolutely, it was legal . . . it was an opportunity not to be missed." One of the Board members asked about the potential ramifications if the School District failed to spend the bond proceeds. Hennon recalls being concerned because she "was not ready to commit to a building project" and "didn't want to tacitly be voting for a building project that [she] was not ready to vote for." Weiss advised the Board that there would be no problem "so long as you intend to do the projects." According to Harry Flannery, the Board president, "we were advised that we just needed to have the intent to do the projects . . . even if we didn't follow through with the projects." Weiss gave the impression that "there was no need to proceed" and that the projects "didn't even have to occur."

According to Weiss, Board members discussed various projects at the meeting and "all nodded they were going to do them." Weiss asked whether there was an architect "on board" for the projects, and "there were nods of assent that there was an architect in place." In fact, although the School District had a "longstanding" relationship with Eckles Architecture and had received a proposal for a construction project at Neshannock Elementary School in July 1999, the Board did not hire an architect until October 2001. Weiss knew that the Board had neither contracted for projects nor even authorized advertising for bids. Nevertheless, he made no further attempt to confirm whether the Board actually had hired an architect – for example, by calling the architect or asking to see a contract.

The Board approved the bond proposal at another

7

meeting on May 31, 2000. The next day, Weiss asked Mento, the superintendent, to prepare a letter for the Board to certify. Weiss provided a proposed form for this letter, which called for a list of "capital projects which the District is contemplating undertaking in the next three years to utilize the proceeds of the Note issue." Weiss used the word "contemplating" because he understood that there might be disagreement among the Board members and administrators about which projects to perform. The form called for a list of the "projects and their anticipated estimated costs." On June 15, 2000, Mento replied with a certificate – which the Board authorized – utilizing the same language Weiss proposed and listing thirty-three projects that "the District is contemplating undertaking," but did not provide cost estimates. Weiss was upset that Mento had omitted the cost estimates and asked Mento to provide them. Mento never did, and Weiss never obtained cost estimates from anyone else. This project list certificate was the only School District document Weiss reviewed before issuing his bond opinion.

Treasury regulations require that an officer of the issuer certify the issuer's expectations, as of the issue date, regarding the expenditure, time, and due diligence tests. 26 C.F.R. § 1.148-2(b)(2)(i). Weiss prepared this document, known as a nonarbitrage certificate, by adapting a form he had used in prior transactions. The certificate, dated June 28, 2000, addresses each of the three tests in a wholly conclusory manner. As to the expenditure test, the certificate states: "The Issuer reasonably expects that at least eighty-five (85%) percent of the proceeds of the Notes . . . will have been expended prior to the date that is three years from the Closing Date." As to the time test, the certificate states: "The Issuer reasonably expects that prior to the expiration of six months . . ., there will be binding obligations to expend in the aggregate at least five (5%) percent of the proceeds of the Notes." As to the due diligence test, the certificate states: "The Issuer reasonably expects that the Project will proceed with due diligence to completion." The certificate

includes no discussion of the basis for these conclusions, and does not define "the Project" or reveal what the term involves. In Weiss's judgment, referring to "the Project" in this manner was "adequate."

Aside from Weiss, no one with an understanding of the three tests reviewed the nonarbitrage certificate before the closing. Weiss gave the School District's lawyer, Richard Flannery, a draft of the certificate. Flannery read it and assumed it was "in order . . . based on the fact [that] I received it from our bond counsel." At closing, Carol Robinson, the School District's business manager, signed the document on behalf of the School District, but had no understanding of its contents.

Shupe drafted the official statement – also known as a bond prospectus – that the School District distributed in connection with the bond offering. Weiss reviewed Shupe's draft. The official statement, dated June 28, 2000, states that the proceeds from the offering "will be used to provide funds for Capital Improvement Projects of the School District and to pay all costs and expenses related to the issuance." The statement lists Weiss as "Note Counsel" and states: "In the opinion of Note Counsel, under existing laws and assuming continuing compliance by the School District with certain covenants related to the Code, interest on . . . the Notes [is] excluded from gross income for Federal income tax purposes."

Weiss also prepared two documents addressed "To the purchasers of the . . . Bonds." The first document was an opinion letter dated June 28, 2000, in which Weiss represented that his opinions were based on his examination of "certain statements, certifications, reports, affidavits, documents and agreements pertaining to the issuance and sale of the Notes." Weiss then stated: "Under existing statutes, regulations and decisions, interest on the Notes . . . is excluded from gross income for purposes of Federal income taxation . . ..

Furthermore, the Notes are not 'arbitrage bonds.'" Because Weiss did not mention any risk that interest on the bonds might be taxable, his bond opinion was "unqualified." The second document was a supplemental opinion letter also dated June 28, 2000. In this letter, Weiss stated: "Nothing has come to my attention in the course of my professional engagement in connection with the Notes which has led me to believe that the Official Statement contains any untrue statements [or omissions] of a material fact."

When the bond transaction closed on June 28, 2000, the Board had not held any public hearings on which projects to undertake. Thereafter, the School District performed no work on any construction project for more than a year. On November 8, 2000, the Internal Revenue Service notified the School District that it intended to examine the bond transaction. The School District redeemed the bonds on May 15, 2001, having earned about $150,000 in arbitrage profits in less than a year. On September 25, 2001, the IRS notified the School District of its preliminary determination that the School District had issued the bonds without any reasonable expectation to use the proceeds properly and had intended to earn profits from arbitrage. In 2002, the School District and the IRS entered into a settlement that preserved the tax-exempt status of the bonds and required the School District to pay its arbitrage profits to the federal government.

The SEC initiated an administrative proceeding against Weiss and Shupe regarding this bond transaction. Shupe entered into a settlement in which he agreed to the entry of a cease-and-desist order and disgorgement of his profits. L. Andrew Shupe II, Securities Act Release No. 8459, Exchange Act Release No. 50,235, 83 SEC Docket 2113 (Aug. 24, 2004). The SEC charged Weiss with having violated, and having caused the School District to violate, section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a); section 10(b) of the Securities

Exchange Act of 1934, 15 U.S.C. § 78j(b); and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5. After a four-day hearing, an administrative law judge found in favor of Weiss. *Ira Weiss*, Initial Decisions Release No. 275, 2005 SEC LEXIS 431 (Feb. 25, 2005).

In an opinion four Commissioners joined, with one Commissioner dissenting, the SEC reversed. *Ira Weiss*, Securities Act Release No. 8641, Exchange Act Release No. 52,875, 2005 SEC LEXIS 3107 (Dec. 2, 2005). The SEC found that Weiss violated sections 17(a)(2) and 17(a)(3) of the Securities Act because his opinions to prospective bond purchasers misrepresented the risk that interest on the bonds would be taxable. According to the SEC, "Weiss's failure to look for even minimal objective indicia of the School District's reasonable expectations to spend Note proceeds on projects was at least negligent."

### III.

The Securities Act imposes liability for material misrepresentations or deceit in connection with a securities offering. Under section 17(a)(2), it is unlawful for any person in the offer or sale of securities "to obtain money or property by means of any untrue statement of a material fact or any [material] omission." 15 U.S.C. § 77q(a)(2). Under section 17(a)(3), it is unlawful for any person in the offer or sale of securities "to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a)(3). Proof of negligence is sufficient to establish a violation of these provisions. *See Aaron v. SEC*, 446 U.S. 680, 697, 701-02 (1980).

The SEC identifies three documents containing material misrepresentations under section 17(a)(2) and representing

deceitful acts under section 17(a)(3): the official statement, Weiss's opinion letter, and his supplemental opinion letter.

With respect to the official statement, Weiss believes that he cannot be liable for the statement there attributed to him because the president of the Board – not Weiss – signed the document and the School District – not Weiss – distributed it. But Weiss reviewed the official statement and approved the portion of it containing his opinion that the bonds would be tax-exempt. He knew his statement would reach potential investors. Therefore Weiss could incur liability for his misrepresentations even when he did not communicate them directly to investors. *See Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1226 (10th Cir. 1996); *accord Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998); *SEC v. Holschuh*, 694 F.2d 130, 142 (7th Cir. 1982). In any event, Weiss effectively adopted the relevant portion of the official statement in his supplemental opinion letter, in which he stated that he was unaware of any material misrepresentation or omission in the official statement.

Weiss seems to think that the tax opinions he expressed in his opinion letters were simply that – opinions containing no statements of fact on which to predicate liability for misrepresentation or deceit. Under the securities laws, a statement of opinion includes an implied representation that the speaker rendered the opinion in good faith and with a reasonable basis. *See Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1277 (D.C. Cir. 1994). Good faith alone is not enough. An opinion must have a reasonable basis, and there can be no reasonable basis for an opinion without a reasonable investigation into the facts underlying the opinion. Weiss thus implicitly represented that he had conducted "a reasonably sufficient examination of material legal and factual sources and [had] reasonable certainty as to the subjects addressed therein." NABL STATEMENT at 9. Weiss's opinion letter led investors to believe just that: he there stated that he based his opinion on "certain statements,

certifications, reports, affidavits, documents and agreements." Yet the only School District document Weiss examined was Mento's list of thirty-three projects, which contained no cost estimates and no schedules. As the SEC found, this document was nothing more than a "wish list" of projects the Board was *considering*, not a list of the projects the Board had *decided* to undertake.

Weiss also seeks to avoid liability on the basis that he conducted a reasonably sufficient examination by relying on his client's certified representations that he had no reason to believe were false. There is ample evidence to support the SEC's rejection of this defense on the ground that the representations Weiss cites were too "vague" for him reasonably to rely upon them. Consider the nonarbitrage certificate. Treasury regulations require nonarbitrage certificates to "state the facts and estimates that form the basis for the issuer's expectations" of meeting the three tests. 26 C.F.R. § 1.148-2(b)(2)(i). Yet the School District's certificate – which Weiss drafted – is wholly conclusory, stating only that the issuer "reasonably expects" to satisfy each of the three tests. No relevant facts or estimates are recited. The certificate refers to "the Project" – capitalized as if it were a defined term – but contains no description of what "the Project" includes, doubtless because the Board had not made up its mind. The other certified document – Mento's list of thirty-three projects – suffers from the same flaw, for the reasons already mentioned. And Weiss certainly could not base an unqualified tax opinion on the nods of Board members at the only meeting he attended.

Weiss wrongly gave the Board the impression that it merely had to "intend to do the projects," rather than have a reasonable need for the funds before issuing bonds. According to Treasury regulations, issuers must not "issue bonds earlier . . . than is otherwise reasonably necessary." 26 C.F.R. § 1.148-0(a). Whether it is reasonably necessary to issue bonds

depends on whether an issuer has a reasonable expectation of using the proceeds for its capital projects, and this involves an *objective* inquiry. *See id.* § 1.148-1(b) (defining "reasonable expectations"). Therefore, the question is not whether the Board *intended* to do projects, but whether a reasonable person would have *expected* the Board to follow through on those projects in a manner that would satisfy the three tests.

The bond transaction in this case was promoter-induced. Shupe proposed the transaction after learning that the Board was considering capital projects. Shupe used the prospect of arbitrage to sell the transaction. Weiss was at the presentation. Weiss knew that the Board had not contracted for any projects or even sought bids. He could not have been unaware of the substantial likelihood that the Board would fail to satisfy the three tests. Yet Weiss never asked the Board to confirm that it was committed to specific projects or was ready to proceed with them. Substantial evidence thus supports the SEC's conclusion that "Weiss was responsible for misrepresentations and omissions in the Official Statement and in his legal opinions," which failed to provide investors with "full information concerning the substantial risk that the IRS would find the Notes to be taxable." The petition for judicial review is therefore denied.

*So ordered.*