# IN THE SUPREME COURT OF CALIFORNIA

STEPHEN K. DAVIS,

Plaintiff and Appellant,

v.

FRESNO UNIFIED SCHOOL DISTRICT et al.,

Defendants and Respondents.

S266344

Fifth Appellate District
F079811

Fresno County Superior Court
12CECG03718

April 27, 2023

Justice Jenkins authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan, Liu, Kruger, Groban, and Evans concurred.

DAVIS v. FRESNO UNIFIED SCHOOL DISTRICT

S266344


Opinion of the Court by Jenkins, J.


Plaintiff Stephen K. Davis sued the Fresno Unified School District (the District) and Harris Construction Co., Inc. (the Contractor), alleging that defendants entered into a lease-leaseback construction agreement in violation of various statutes and common law rules. The lawsuit raises numerous legal questions and has a lengthy procedural history. However, we granted review to address a single question: "Is a lease-leaseback arrangement in which construction is financed through bond proceeds rather than by or through the builder a 'contract' within the meaning of Government Code section 53511?" We conclude that the specific lease-leaseback arrangement at issue here is not a "contract[]" within the meaning of Government Code section 53511 (section 53511). A local agency contract is subject to validation under section 53511 if it is inextricably bound up with government indebtedness or with debt financing guaranteed by the agency. To satisfy this standard, the contract must be one on which the debt financing of the project directly depends. The lease-leaseback arrangement at issue here does not satisfy this standard because the underlying project was fully funded by a prior sale of general obligation bonds, and payment of the debt service on the bonds was from ad valorem property taxes. Therefore, payment did not depend on the lease-leaseback arrangement or even on completion of the project. In light of this conclusion, we affirm the judgment of the Court of Appeal.

## I. FACTS

On March 6, 2001, voters within the District approved Measure K, authorizing the District to sell bonds to raise money for improvements to school facilities. On November 2, 2010, voters within the District approved Measure Q, authorizing additional bonds for the same general purpose. The ballot measures were broadly worded, listing hundreds of projects at numerous school sites. They did not require the District to complete all the listed projects, and they did not specify details about individual projects or how the necessary agreements with architects and builders would be structured. On October 13, 2011, the District sold $55,570,914.90 in Series G general obligation bonds (Measure K) and $50,434,849.50 in Series B general obligation bonds (Measure Q). To pay the debt service on the bonds, the District pledged receipts from certain levies of ad valorem taxes on property within the District. The total purchase price for the Series G bonds was $55,570,914.90. The total purchase price for the Series B bonds (which included a larger original issue premium than the Series G bonds) was $52,148,790.01. Therefore, on the closing date of October 13, 2011, the District received nearly $108 million in immediately available funds. For federal tax reasons, it was advantageous to the District to proceed quickly with the planned school facility improvements, spending the money received from sale of the bonds.

In September 2012, the District entered into a $36.7 million deal with the Contractor for the construction of a new middle school on land the District owned at 1100 East Church Avenue in Fresno. The deal was structured as a lease-leaseback arrangement under Education Code section 17406. Under that arrangement, the District leased its land to the

Contractor for $1 (the Site Lease). The Contractor then constructed the new school facilities on the land and leased the land and the new facilities (still under construction) back to the District (the Facilities Lease). The Facilities Lease obligated the Contractor to build the new school facilities in accordance with "Construction Provisions" that were detailed in a 56-page document attached as an exhibit to the lease, and it obligated the District to make monthly "Lease Payments" that reflected "the value of the construction service work performed" during the month in question, less a five percent "retainage."[1] The Contractor was obligated to complete the construction within 595 days, and the total price for the project was not to exceed $36,702,876. Under the agreement, the final lease payment had to be made within 35 days of the recordation by the District of a "Notice of Completion," indicating completion of the construction, and both the Site Lease and the Facilities Lease terminated once that final lease payment was made, with the District gaining title to the site and the newly constructed facilities.

The Site Lease and Facilities Lease were both executed on September 27, 2012, and the notice of completion was recorded by the District on December 4, 2014, stating that the work had been completed on November 13, 2014.

---

[1] The withholding of "retainage" until construction of the entire project is complete is a standard practice in the construction industry. Retainage is usually five or 10 percent of the amount otherwise due. (See *United Riggers & Erectors, Inc. v. Coast Iron & Steel Co.* (2018) 4 Cal.5th 1082, 1087–1088; *Cates Construction, Inc. v. Talbot Partners* (1999) 21 Cal.4th 28, 55; *Yassin v. Solis* (2010) 184 Cal.App.4th 524, 533–534; *McAndrew v. Hazegh* (2005) 128 Cal.App.4th 1563, 1566–1567.)

## II. PROCEDURAL HISTORY

Plaintiff owns real property and pays taxes within the Fresno Unified School District. In addition, plaintiff is the president of Davis Moreno Construction, Inc., a Fresno-based contractor that has handled construction projects for school districts. (See *Davis v. Fresno Unified School Dist.* (2015) 237 Cal.App.4th 261, 273, fn. 4 (*Davis I*).) Plaintiff brought this action on November 20, 2012, asserting that the construction arrangement between the District and the Contractor was invalid and seeking, among other things, an order requiring the Contractor to pay back to the District money payments it had received under the Facilities Lease. On March 19, 2013, plaintiff filed a first amended complaint, which is the operative complaint. The trial court sustained demurrers to that complaint, entered judgment for defendants, and plaintiff appealed. The Court of Appeal then reversed and remanded. After further proceedings, the trial court eventually granted defendants' motion for judgment on the pleadings, a motion asserting that the lawsuit became moot when the construction of the new school facilities was completed and the leases terminated. Plaintiff again appealed, and the Court of Appeal again reversed. The Court of Appeal's second judgment of reversal is now before us on review.

The main issue in the second appeal is whether plaintiff's lawsuit became moot when the leases terminated. The trial court agreed with defendants that the lawsuit was exclusively a reverse validation action brought under the validation provisions of the Code of Civil Procedure (see Code Civ. Proc.,

§ 860 et seq.),[2] and consistent with settled law, the trial court ruled that a reverse validation action — which is a proceeding in rem — becomes moot when the contract at issue has been fully performed (see *Wilson & Wilson v. City Council of Redwood City* (2011) 191 Cal.App.4th 1559, 1579–1581). The trial court rejected plaintiff's argument that the lawsuit was not moot because the validation statutes were only *one* of several theories of standing under which he was bringing his lawsuit. The trial court reasoned that when the validation statutes apply, they are a party's exclusive remedy. (See Code Civ. Proc., § 869; see also *Friedland v. City of Long Beach* (1998) 62 Cal.App.4th 835, 849–850 (*Friedland*).)

On appeal, plaintiff argued that the first amended complaint "was both an in rem validation action and an in personam disgorgement action based upon multiple legal theories," and plaintiff asserted that the action was not moot as to his disgorgement claims. The Court of Appeal agreed, reversing the trial court. (*Davis v. Fresno Unified School Dist.* (2020) 57 Cal.App.5th 911, 941–942 (*Davis II*).)

In support of its conclusion that plaintiff's action was not moot, the Court of Appeal first considered whether the operative complaint had adequately alleged an in personam taxpayer action (Code Civ. Proc., § 526a) in addition to an in rem validation action (Code Civ. Proc., § 863). (See *Davis II*, *supra*, 57 Cal.App.5th at pp. 930–936.) As the Court of Appeal noted, the complaint refers to the lawsuit as an "*in rem* proceeding" based on Code of Civil Procedure section 863, but it also refers to the lawsuit as a "suit filed by a taxpayer," and it requests in

---

[2] For convenience, we collectively refer to these provisions of the Code of Civil Procedure as "the validation statutes."

personam relief that is not available in an in rem proceeding. Accordingly, the Court of Appeal concluded that plaintiff had adequately alleged standing to sue based on both a reverse validation theory and a taxpayer theory. (*Davis II*, at pp. 933–936.) The Court of Appeal then proceeded to consider whether the validation statutes were plaintiff's exclusive remedy, precluding recovery on plaintiff's taxpayer theory. Rather than addressing that issue on the merits, however, the court *assumed* that the validation statutes would be plaintiff's exclusive remedy if they were applicable, and it held that the validation statutes did not apply. (*Id.* at pp. 939–942.)

As the Court of Appeal explained, the validation statutes establish a general procedure for testing the validity of public agency actions, but the validation procedure is not available unless some *other* statute authorizes its use in a particular context. The Court of Appeal noted that the sole basis for defendants' contention that the validation statutes applied in this case was Government Code section 53511. (*Davis II, supra,* 57 Cal.App.5th at p. 939.) The court examined section 53511, and it rejected defendants' argument that the language of that section encompassed the lease-leaseback arrangement at issue here. (*Davis II,* at pp. 940–941.) Absent a statutory basis to support a reverse validation claim, the Court of Appeal concluded that plaintiff could not assert a viable claim under the validation statutes — which of course meant that those statutes could not be plaintiff's exclusive remedy. (*Id.* at p. 941.)

Having found the validation statutes inapplicable, the Court of Appeal concluded that plaintiff's taxpayer action (Code Civ. Proc., § 526a) should have survived defendants' motion for judgment on the pleadings. (*Davis II, supra,* 57 Cal.App.5th at

pp. 941–942.)  It therefore reversed the trial court's judgment. (*Id*. at pp. 944–945.)

We granted defendants' petitions for review.  We conclude that the lease-leaseback arrangement at issue here is not a "contract[]" within the meaning of section 53511, and therefore we agree with the Court of Appeal that the validation statutes do not apply.  Accordingly, we affirm the judgment of the Court of Appeal.

## III. DISCUSSION

Our analysis begins in part III.A., with background information regarding the use of lease-leaseback arrangements to construct school facilities in California.  Then, in part III.B., we discuss the validation provisions of the Code of Civil Procedure.  In part III.C., we turn to section 53511, concluding that the lease-leaseback arrangement at issue here does not qualify as a contract for purposes of section 53511, and therefore the validation statutes do not apply.  Finally, in part III.D., we reject defendants' arguments to the contrary.

### A. History of Lease-leaseback Construction in California

The state Constitution imposes restrictions on local government debt.  Specifically, such debt may not exceed the total annual income and revenues of the local entity in question without satisfying specified voter-approval requirements.  (See Cal. Const., art. XVI, § 18, subd. (a).)  This court held, however, in *City of Los Angeles v. Offner* (1942) 19 Cal.2d 483, that the cumulative amount payable under a multiyear lease is not a debt for purposes of the Constitution's debt limitation — provided, that is, that the local entity receives appropriate

consideration in each year for the lease payments it makes during that year.

In 1957, 15 years after our decision in *City of Los Angeles v. Offner*, *supra*, 19 Cal.2d 483, the Legislature enacted the provision of the Education Code that is at the heart of this proceeding, authorizing school districts to use lease-leaseback arrangements as a way of financing the construction of school facilities. (See Stats. 1957, ch. 2071, § 1, pp. 3683–3687.) The lease-leaseback provision is now codified in Education Code section 17406 (section 17406).[3] Under section 17406, a school

---

[3]    As of the date defendants entered into the lease-leaseback arrangement at issue here, former section 17406 provided: "(a) Notwithstanding Section 17417, the governing board of a school district, without advertising for bids, may let, for a minimum rental of one dollar ($1) a year, to any person, firm, or corporation any real property that belongs to the district if the instrument by which such property is let requires the lessee therein to construct on the demised premises, or provide for the construction thereon of, a building or buildings for the use of the school district during the term thereof, and provides that title to that building shall vest in the school district at the expiration of that term. The instrument may provide for the means or methods by which that title shall vest in the school district prior to the expiration of that term, and shall contain such other terms and conditions as the governing board may deem to be in the best interest of the school district. [¶]  (b) Any rental of property that complies with subdivision (a) shall be deemed to have thereby required the payment of adequate consideration for purposes of Section 6 of Article XVI of the California Constitution." (Stats. 1996, ch. 277, § 3, p. 2126.)  This provision was first enacted as Education Code former section 18355. (Stats. 1957, ch. 2071, § 1, p. 3683.)  In 1959, it was renumbered as former section 15705. (Stats. 1959, ch. 2, § 1, pp. 1086–1087.)  Then, in 1976, it was renumbered as former section 39305. (Stats. 1976, ch. 1010, § 2, p. 3167.)  Finally, in

district may lease its land to a builder (or some related entity) for $1 per year, and the builder then constructs a building or buildings on that land. Typically, the builder is compensated by leasing the land and the newly constructed school facilities back to the school district for a period of several years after construction is complete, receiving regular lease payments under that multiyear lease. (See Ed. Code, § 17417.) Finally, when both leases terminate, title to the land and the new facilities vests in the school district. (*Id.*, § 17406.) In this way, the school district obtains costly improvements to its school facilities and pays for them over the course of many years, but it does so without entering into a debt obligation that would require voter approval. In essence, the school district shifts the financing of the construction project to the builder (or some related entity), who in order to secure that financing, is free to assign to a lender its right to receive lease payments from the school district. (See, e.g., *City of Desert Hot Springs v. County of Riverside* (1979) 91 Cal.App.3d 441, 444–445.) Thus, consistent with the provisions of section 17406, even though a school district may end up making payments directly to a lender, from the district's perspective, the payments are lease payments and not debt service.

Significantly, section 17406 does not merely provide a method by which a school district can avoid the state Constitution's debt restrictions; it also allows a school district to avoid competitive bidding requirements otherwise mandated by

1996, it was given its present number. (Stats. 1996, ch. 277, § 3, p. 2126.)

state law.[4]  Moreover, some districts use lease-leaseback arrangements for the latter purpose alone.  Under this approach, there is no multiyear leaseback of the completed project to the school district after construction is complete, and therefore there is no builder financing of the project.  The lease payments by the school district compensate the builder for construction services performed during the period that the payment covers, and when the project is complete, the lease payments cease.

The Courts of Appeal have reached conflicting decisions as to whether this manner of structuring a lease-leaseback arrangement is consistent with section 17406 (compare *Davis I*, *supra*, 237 Cal.App.4th 261 [§ 17406 applies only to builder-financed projects, not projects that are independently financed by the school district] with *California Taxpayers Action Network v. Taber Construction, Inc.* (2017) 12 Cal.App.5th 115 [rejecting that conclusion] and *McGee v. Balfour Beatty Construction, LLC* (2016) 247 Cal.App.4th 202 [same]), but that split of authority is *not* before us.  Instead, the narrow question we decide here is whether a validation action under the validation statutes (Code Civ. Proc., § 860 et seq.) is the appropriate procedural vehicle for challenging the validity of a lease-leaseback project that is

---

[4]   The Legislature has shown some concern about the fact that lease-leaseback arrangements are exempt from competitive bidding.  Section 17406 was amended in 2016 (after the project at issue in the present case was complete) to impose a competitive bidding requirement, effective January 1, 2017 (see Stats. 2016, ch. 521, § 2), but that amendment also included a sunset provision, meaning that the law would revert to its pre-2017 form on July 1, 2022 (see Stats. 2016, ch. 521, § 3).  In 2021, the sunset provision was extended to July 1, 2027.  (See Stats. 2021, ch. 666, § 5.)

independently financed by the school district. The resolution of that question turns on whether such a lease-leaseback arrangement qualifies as a "contract[]" for purposes of section 53511.

## B. Validation Actions

An action under the validation statutes permits a public agency to obtain a judgment upholding its handling of an agency matter. (Code Civ. Proc., § 860.)[5] We discussed the history of the validation procedure in *Bonander v. Town of Tiburon* (2009) 46 Cal.4th 646. There we said: "By 1961, the California codes contained a patchwork of provisions governing validation proceedings, with each set of provisions dedicated to a different statutory scheme. In that year, the Legislature sought to replace this patchwork with a general validation procedure. (Stats. 1961, ch. 1479, §§ 1–3, pp. 3331–3332.) This procedure, which the Legislature codified as Code of Civil Procedure sections 860 through 870, does not, in itself, authorize any validation actions; rather, it establishes a uniform system that other statutory schemes must activate by reference." (*Bonander*, at p. 656.) Therefore, if no statute authorizes use of the validation statutes to test a particular type of agency matter, then the validation statutes do not apply.

Significantly, validation actions are not always brought by the agency involved in the matter. Code of Civil Procedure

---

[5] Code of Civil Procedure section 860 provides: "A public agency may upon the existence of any matter which under any other law is authorized to be determined pursuant to this chapter, and for 60 days thereafter, bring an action in the superior court of the county in which the principal office of the public agency is located to determine the validity of such matter. The action shall be in the nature of a proceeding in rem."

section 863 authorizes private parties to bring validation actions, and the private party is often seeking to invalidate the matter in question. Code of Civil Procedure section 863 provides in relevant part: "If no proceedings have been brought by the public agency pursuant to this chapter, *any interested person* may bring an action within the time and in the court specified by Section 860 to determine the validity of such matter." (Italics added.) Actions brought by private parties under section 863 are sometimes called reverse validation actions.

A validation action is "a proceeding in rem" (Code Civ. Proc., § 860), which means that the judgment binds all persons and entities having an interest in the agency matter in question. It also means, however, that in a validation action, the plaintiff cannot obtain injunctive relief against a party to the action, for such relief would be in personam. (See *City of Ontario v. Superior Court* (1970) 2 Cal.3d 335, 344 (*City of Ontario*); *Friedland*, *supra*, 62 Cal.App.4th at p. 843.) Moreover, when the validation statutes apply, they supersede other mechanisms by which an interested private party might seek to challenge the same agency matter. This preclusion of alternative remedies is necessary if the validation statutes are to serve their purpose of once and for all determining the validity of the agency matter. Thus, Code of Civil Procedure section 869 provides in relevant part: "No contest except by the public agency or its officer or agent of any thing or matter under this chapter shall be made other than within the time and the manner herein specified."

In *City of Ontario*, we interpreted this provision as insulating agency matters from challenge once the short limitations period for bringing a validation action has passed. We said: "The practical consequence of [the validation statutes] should be clearly recognized: an agency may indirectly but

effectively 'validate' its action *by doing nothing to validate it*; unless an 'interested person' brings an action of his own under [Code of Civil Procedure] section 863 within the 60-day [limitations] period, the agency's action will become immune from attack whether it is legally valid or not." (*City of Ontario, supra*, 2 Cal.3d at pp. 341–342.) Courts have regularly applied this principle, using enforcement of section 863's 60-day limitations period to reject challenges to a wide variety of agency matters. (See, e.g., *Santa Clarita Organization for Planning & Environment v. Castaic Lake Water Agency* (2016) 1 Cal.App.5th 1084, 1097 (*Santa Clarita*) [citing cases].)

Despite this rule precluding alternative remedies whenever the validation remedy is available, several courts have held that when an interested party brings a *timely* validation action, it can join other claims, including a taxpayer action brought pursuant to Code of Civil Procedure section 526a. (See *Regus v. City of Baldwin Park* (1977) 70 Cal.App.3d 968, 972; see also *Coachella Valley Water Dist. v. Superior Court* (2021) 61 Cal.App.5th 755, 771; *McLeod v. Vista Unified School Dist.* (2008) 158 Cal.App.4th 1156, 1166–1167 (*McLeod*).) What is less clear is the extent to which a joined taxpayer action may relate to the same subject matter as the validation action, thus allowing the successful plaintiff to augment the in rem relief available under the validation statutes with the in personam relief available under section 526a. Several Court of Appeal decisions have held that the joined taxpayer action may *not* relate to the same subject matter as the validation action, thus making the validation remedy exclusive as to matters that are subject to validation. (See *Friedland, supra*, 62 Cal.App.4th at pp. 848–849; see also *McGee v. Torrance Unified School Dist.* (2020) 49 Cal.App.5th 814, 827–828 (*McGee*); *Katz v. Campbell*

*Union High School Dist.* (2006) 144 Cal.App.4th 1024, 1033–1034.)

The trial court in this case aligned with the view that the validation statutes are a party's exclusive remedy as to matters that are subject to validation, thus precluding plaintiff's request for in personam relief. The Court of Appeal, however, did not reach that question. Instead, the Court of Appeal assumed that the validation statutes, if applicable, would have had such a preclusive effect (*Davis II*, *supra*, 57 Cal.App.5th at p. 939), and it concluded that the validation statutes did not apply. We now turn to that issue.

### C. Section 53511

In proceedings below, defendants relied exclusively upon section 53511 to support their contention that the validity of a lease-leaseback arrangement like the one at issue here falls within the ambit of the validation statutes. Section 53511 provides in full: "(a) A local agency may bring an action to determine the validity of its bonds, warrants, *contracts*, obligations or evidences of indebtedness pursuant to [the validation statutes]. [¶] (b) A local agency that issues bonds, notes, or other obligations the proceeds of which are to be used to purchase, or to make loans evidenced or secured by, the bonds, warrants, *contracts*, obligations, or evidences of indebtedness of other local agencies, may bring a single action in the superior court of the county in which that local agency is located to determine the validity of the bonds, warrants, *contracts*, obligations, or evidences of indebtedness of the other local agencies, pursuant to [the validation statutes]." (Italics added.)

When as here we are interpreting a statute, " ' " '[o]ur fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. . . . If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy.' [Citation.] 'Furthermore, we consider portions of a statute in the context of the entire statute and the statutory scheme of which it is a part, giving significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose.' " ' " (*Brennon B. v. Superior Court* (2022) 13 Cal.5th 662, 673.) " 'The interpretation of a statute presents a question of law that this court reviews de novo.' " (*Segal v. ASICS America Corp.* (2022) 12 Cal.5th 651, 662.)

Although one plausible reading of the language of section 53511 is that any and all local agency "contracts" are subject to validation under the validation statutes, the Court of Appeal below did not interpret section 53511 so broadly. Rather, the court plausibly concluded that the reference to "contracts" in section 53511 refers only to contracts that are of the same type or that share the same subject matter as the other items listed in the section. Because the other items all relate to government indebtedness, the Court of Appeal reasoned that the word "contracts" in section 53511 refers only to contracts that relate to government indebtedness or, at least, to the financing of local agency projects. (*Davis II*, *supra*, 57 Cal.App.5th at p. 940.) The Court of Appeal therefore concluded that a lease-leaseback

arrangement like the one at issue here, one that does not operate as a mechanism for financing a government construction project, is not a "contract[]" for purposes of section 53511. And it follows from that conclusion that section 53511 does not authorize the use of the validation statutes in this case. (*Davis II*, at p. 941.)

Because the term "contracts" in section 53511 is ambiguous in this way, we must employ the usual methods of statutory construction to determine the Legislature's intent with respect to that provision. The threshold question we must decide is whether, under section 53511, any and all local agency contracts are subject to validation or whether, under that section, only a particular type of local agency contract is subject to validation. Then, if we conclude that only a particular type of agency contract is subject to validation under section 53511, we must consider what that type is and whether it includes the lease-leaseback arrangement at issue here.

### 1. Does the word "contracts" in section 53511 mean any and all local agency contracts?

The threshold question is not seriously disputed by the parties, who are generally willing to concede that the term "contracts" in section 53511 does not refer to any and all local agency contracts. This absence of dispute is because we addressed the question in dictum in *City of Ontario*. What we said in *City of Ontario* is persuasive, and it bears repeating here at length: Section 53511 "lists, as matters for validation under [the validation statutes], 'bonds, warrants, *contracts*, obligations or evidences of indebtedness' (italics added). There is no limitation or qualification on the word 'contracts,' and it would therefore appear to include a multipurpose municipal contract such as the Ontario Motor Stadium Agreement. Yet the

legislative history of the statute suggests a contrary result. First, the Legislative Counsel's digest of the bill proposing section 53511 characterized the measure as one allowing 'a local agency to bring an action to determine the validity of evidences of indebtedness.' Second, section 53511 was enacted as part of chapter 3 of part 1, division 2, title 5, of the Government Code. Chapter 3 is entitled 'Bonds,' and deals exclusively with the power of local agencies to sell their bonds, replace defaced or lost bonds, and pledge their revenues to pay or secure such bonds. If section 53511 was intended to be a provision of general application, logically it should have been placed in article 4 ('Miscellaneous') of chapter 1 ('General') of the same part, in which a group of such unrelated matters are collected. Third, the key language of section 53511 — 'bonds, warrants, contracts, obligations or evidences of indebtedness' — was taken directly from section 864 of chapter 9; under well-known canons of statutory interpretation, it should ordinarily be given the same meaning as it had in the earlier statute. But as a perusal of the companion 1961 legislation reveals, when chapter 9 was adopted it was made applicable only to such matters as the legality of the local entity's existence, the validity of its bonds and assessments, and the validity of joint financing agreements with other agencies. If section 53511 was intended to reach any and all contracts into which an agency may lawfully enter, the restricted language of section 864 was inappropriate for that purpose. Finally, that language is peculiarly inapt for expressing such a general meaning in any event, as it lists the word 'contracts' in the midst of four other terms which all deal with the limited topic of a local agency's financial obligations." (*City of Ontario*, *supra*, 2 Cal.3d at pp. 343–344.)

In *City of Ontario*, we did not need to decide the applicability of the validation statutes, because it was enough for us to hold that the question was " 'complex and debatable' " (*City of Ontario, supra*, 2 Cal.3d at p. 345), justifying the trial court's discretionary decision to excuse the plaintiffs' noncompliance (see *id.* at pp. 345–346). Nonetheless, what we said in *City of Ontario* is convincing. We do not believe that the Legislature intended any and all contracts that a local agency might enter into (miscellaneous supply contracts, employment contracts, etc.) to be subject to validation under the validation statutes, which would mean that they would need to be challenged within 60 days (Code Civ. Proc., § 863) or become forever insulated from attack. Validation actions typically apply to public agency matters that by their nature call for an expedited and final determination as to their validity. The need for that sort of expedited validation exists, of course, in the case of agency-issued bonds, because such bonds are far more marketable if their validity can be judicially confirmed in a final judgment. (See *Friedland, supra*, 62 Cal.App.4th at p. 843; *Walters v. County of Plumas* (1976) 61 Cal.App.3d 460, 468 (*Walters*).) By contrast, it would be extraordinary for the Legislature to adopt a law applying the validation statutes to any contract a local agency might execute, irrespective of the need for expeditious resolution of the contract's validity (see *City of Ontario*, at pp. 341–342), and we conclude that the Legislature did not do so. (See *Kaatz v. City of Seaside* (2006) 143 Cal.App.4th 13, 42, fn. 35 [citing cases holding that various routine local agency contracts are *not* subject to validation].)

The more reasonable approach, therefore, is to apply the rule of *noscitur a sociis*, according to which, a specific item in a statutory list of items is qualified by the overall type or subject

matter characterizing the list as a whole. (See *Kaatz v. City of Seaside, supra*, 143 Cal.App.4th at p. 40.) Thus, the word "contract[]" in section 53511 is defined by the subject matter of the other items in the list, which is, of course, government indebtedness. It follows that under section 53511, only contracts that somehow relate to government indebtedness are subject to validation, but the particulars of that necessary relationship remain to be determined. We now turn to that issue.

### 2. *What contracts sufficiently relate to government indebtedness to bring them within the scope of section 53511?*

At places in their briefs, defendants press a broad argument that every local agency contract that is funded by the proceeds of a sale of agency bonds is, for that reason alone, related to government indebtedness and therefore subject to the validation statutes under section 53511. At other places, however, defendants make several more specific arguments focusing on the special nature of schools and the complexities of federal tax law. We address defendant's more specific arguments in part III.D., *post*, but we reject at the outset defendants' broad argument that every local agency contract that is funded by local agency bonds is subject to validation. Under that interpretation, even minor contracts, such as a contract to resurface a roof, install a fence, or pave a parking lot, would be subject to validation, provided that government indebtedness funded the contract. A minor contract of the sort just described might not even come to the public's attention during the 60-day limitations period that applies to validation actions (Code Civ. Proc., § 863), and by the time the public learned of the contract, the contract would already be insulated

from attack, making it possible for local public agencies to award such contracts with minimal accountability. Therefore, California case law suggests that a tighter degree of interdependence between a local agency contract and government indebtedness is necessary for the contract to come within the scope of section 53511.

Several courts have framed the pertinent inquiry by asking whether government indebtedness is "inextricably bound up with" the contract in question. (*Graydon v. Pasadena Redevelopment Agency* (1980) 104 Cal.App.3d 631, 646 (*Graydon*); see *McLeod, supra*, 158 Cal.App.4th at p. 1169; *California Commerce Casino, Inc. v. Schwarzenegger* (2007) 146 Cal.App.4th 1406, 1430, 1432 (*California Commerce Casino*); *Kaatz v. City of Seaside, supra*, 143 Cal.App.4th at p. 45.) More specifically, in those situations where the contract is not *itself* a contract of indebtedness, courts have focused on whether it is a contract on which the debt financing of a local agency project directly depends. The latter category includes, for example, local agency contracts that serve to guarantee a debt incurred by a third party. (See *Friedland, supra*, 62 Cal.App.4th at pp. 843, 845 [local agencies' guarantees, necessary to allow public benefit corporation to obtain project financing, were subject to validation under § 53511]; *Walters, supra*, 61 Cal.App.3d at pp. 466–468 [county loan guarantees, necessary for private franchisees to finance heavy equipment needed to operate county waste disposal system, were subject to validation under § 53511].) In addition, the category includes local agency contracts that are intended to generate the funds from which a government debt will be paid. (See *California Commerce Casino, supra*, 146 Cal.App.4th at pp. 1424–1433 [legislative ratification of gaming compacts, where state bonds would be

paid using revenue from the compacts, was subject to validation under Gov. Code, § 17700, which uses parallel language to § 53511]; *Meaney v. Sacramento Housing & Redevelopment Agency* (1993) 13 Cal.App.4th 566, 576–577 (*Meaney*) [interagency agreement to use redevelopment tax increment to pay for courthouse construction was subject to validation under § 53511]; *Graydon, supra,* 104 Cal.App.3d at pp. 645–646 [redevelopment agency's contract for construction of underground parking garage, where garage was financed with bonds to be paid from tax increment generated by retail center of which the garage was an essential component, was subject to validation under § 53511].)[6]

We agree generally with these Court of Appeal decisions and their articulation of the standard that governs whether a local agency contract comes within section 53511. In our view, a local agency contract does so if it is inextricably bound up with government indebtedness or with debt financing guaranteed by

_____

[6] Several of these cases involve tax increment financing. We described such financing in *Amador Valley Joint High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208: "Redevelopment bonds are secured by a pledge of so-called 'tax increment' revenues generated by increases in the assessed value of the redeveloped property. [Citations.] . . . 'In essence [the state Constitution] provides that if, after a redevelopment project has been approved, the assessed valuation of taxable property in the project increases, the taxes levied on such property in the project area are divided between the taxing agency and the redevelopment agency. The taxing agency receives the same amount of money it would have realized under the assessed valuation existing at the time the project was approved, while the additional money resulting from the rise in assessed valuation is placed in a special fund for repayment of indebtedness incurred in financing the project.' " (*Id.* at p. 239.)

the agency. To satisfy this standard, the contract must be one on which the debt financing of the project directly depends. Without attempting to exhaustively describe every type of local agency contract that might come within the scope of section 53511, we conclude that the lease-leaseback arrangement at issue here does not do so.

A traditional lease-leaseback arrangement — one that shifts the financing of a public project to the contractor (or a related entity) through long-term lease payments that the contractor (or related entity) can assign to a third party lender — has some features that might be cited in support of an argument that the arrangement is a contract for purposes of section 53511. Most importantly, a traditional lease-leaseback operates in practice as a financing mechanism. We need not (and do not) decide here whether a traditional lease-leaseback arrangement is a contract for purposes of section 53511, but it is important to note that the lease-leaseback arrangement at issue here did not involve a long-term lease that operated in practice as a financing mechanism. Rather, the cost of the District's new middle school was fully funded by the sale of general obligation bonds that *preceded* the lease-leaseback arrangement by nearly a year,[7] and the lease-leaseback arrangement was to that extent analogous to an ordinary purchase contract for the acquisition of goods or services, a type of contract that is not subject to validation under section 53511. (See, e.g., *Santa Clarita*, *supra*, 1 Cal.App.5th at p. 1099 [agency's cash-financed stock purchase was *not* subject to

---

[7] Under section 53511, the District was free to bring a validation action to confirm the validity of its bonds, thus ensuring their marketability.

validation under § 53511]; *Kaatz v. City of Seaside*, *supra*, 143 Cal.App.4th at pp. 40–42, 47–48 [city's purchase of property from federal government using funds from developer, followed by sale of same property to developer, was *not* subject to validation under § 53511]; *Smith v. Mt. Diablo Unified School Dist.* (1976) 56 Cal.App.3d 412, 418–421 [computer purchase contract was *not* subject to validation under § 53511]; *Phillips v. Seely* (1974) 43 Cal.3d 104, 111–112 [attorney hiring agreement was *not* subject to validation under § 53511].)

Here, nothing in the documents connected to the approval and sale of the District's bonds suggested any link to or dependence upon the validity of the lease-leaseback arrangement now before us. These documents made no specific mention of the project that is the subject of the lease-leaseback arrangement, let alone how contracts related to the project would be structured. Likewise, nothing in the lease-leaseback documentation was concerned with the financing of the project. The Site Lease entailed the letting of the District's valuable real property for a term exceeding two years for the nominal sum of $1; it did not enable the District to finance anything. As for the Facilities Lease, although it was a contract that was critical to the *construction* of the District's new middle school, it was not a contract that was critical to the *financing* of that construction. Rather, as noted, the financing of the project was in place nearly a year before the Facilities Lease was even executed. On October 13, 2011, the District received nearly $108 million, and according to the District's own documentation, it was those funds that were used to make the lease payments for the present project. We conclude, therefore, that the lease-leaseback arrangement was not a contract on which the debt financing of

the project directly depended and that it did not come within the scope of the term "contract[]" for purposes of section 53511.

### D. Defendants' Arguments

Defendants press several more specific arguments for why the lease-leaseback arrangement at issue here was sufficiently related to government indebtedness to qualify as a contract for purposes of section 53511. We address those arguments below.

First, defendants argue that a lease-leaseback arrangement must be subject to swift validation under the validation statutes, for otherwise doubt about the validity of the arrangement will negatively impact the marketability of the bonds the school district sells to finance its planned construction project. On this ground, defendants contend that the lease-leaseback arrangement at issue here was "inextricably bound up with" government indebtedness. (*Graydon*, *supra*, 104 Cal.App.3d at p. 646; see *McLeod*, *supra*, 158 Cal.App.4th at p. 1169; *California Commerce Casino*, *supra*, 146 Cal.App.4th at pp. 1430, 1432.)

This argument would have more persuasive force if the bonds in question were financing the construction of an entity that was going to produce revenue for the District. In that scenario, the anticipated revenues could be used to pay the debt service on the bonds and prompt completion of the construction project and receipt of the revenues could arguably affect the marketability of the bonds. (See *Graydon*, *supra*, 104 Cal.App.3d at p. 645 ["The ability of the Agency to pay its bonds, dependent in large part upon the flow of tax increment monies resulting from the completion of the retail center, was thus directly linked to the award of the questioned contract [for construction of the underground parking garage that would

serve the retail center]"].)  But here, there is no indication that the school facilities were revenue generating in the same way that a commercial redevelopment project would be, and, in any event, there was no plan to pay the debt service on the District's bonds with revenue that would become unavailable if completion of the new middle school facilities was somehow delayed.  Rather, the District planned to pay the debt service using the receipts from levies of ad valorem property taxes, money that would be available regardless of whether the new school facilities were ever completed.

The Contractor argues that top-quality schools often correlate to higher property values, thus generating an increase in tax revenues, and in that sense, debt service on the District's bonds would be paid from new tax revenue that would become unavailable if the school construction project were delayed.  We disagree.  As a preliminary matter, though top-quality schools might correlate to higher property values, there are many possible reasons for this correlation that are not necessarily related to the construction of school facilities itself.  Moreover, the bonds that the District issued to fund the project at issue here were not tax increment bonds.  Therefore, regardless of whether completion of the project would generate an increase in tax revenues, there was no direct relationship between project completion and the marketability of the District's bonds.[8] Indeed, even if the project were somehow delayed, the debt service on the bonds would still be paid from ad valorem taxes on property within the District, and therefore the bonds were marketable.  Thus, the lease-leaseback arrangement at issue

---

[8]     This reasoning applies both to the initial marketability of the bonds and to their subsequent marketability.

here was not " 'inextricably bound up with' " the District's bonds. Moreover, under the Contractor's argument, every debt-financed local agency project would be subject to the validation statutes, because every such project is intended to improve the quality of life in the area and will therefore indirectly increase property values. As already discussed, that rule stretches section 53511 too far.

Second, the District urges a broad interpretation of section 53511 under which a local agency contract is subject to validation if questions about the contract's validity (and the possibility of litigation to resolve those questions) might impair agency operations. For this standard, the District relies on *Walters*, *supra*, 61 Cal.App.3d 460 and *Friedland*, *supra*, 62 Cal.App.4th 835, but an examination of those cases illustrates why the District's interpretation is wide of the mark. Although those cases did discuss possible impairment of agency operations, each of those decisions ultimately determined that the validation statutes applied because the contracts in question guaranteed the debt financing of the project.

*Walters* involved a county plan to use private franchisees to operate the county's waste disposal system. But without loan guarantees by the county, the franchisees were not able to obtain third party financing for the purchase of the necessary heavy equipment. Therefore, the county provided such guarantees, subject to the condition that in the event of a default by the franchisees, the county would gain title to the financed equipment. (*Walters*, *supra*, 61 Cal.App.3d at pp. 463–464.) A county taxpayer then brought a lawsuit that, among other things, challenged the validity of the loan guarantees, and the trial court dismissed the entire suit. The Court of Appeal affirmed dismissal of the specific cause of action that challenged

the loan guarantees. It held that the guarantees were "contracts" for purposes of section 53511, and therefore they were subject to the validation statutes. Hence, the taxpayer's challenge needed to have been brought as a validation action, and it was not. (*Walters*, at pp. 468–469.)

In the course of deciding the *Walters* case, the Court of Appeal made the following general comment about public policy: "[T]he essential difference between those actions which ought and those which ought not to come under [the validation statutes is] the extent to which the lack of a prompt validating procedure *will impair the public agency's ability to operate.*" (*Walters*, *supra*, 61 Cal.App.3d at p. 468, italics added.) The District takes this statement as the operative standard governing application of the validation statutes, arguing that litigation over lease-leaseback arrangements like the one at issue here will impair agency operations, and therefore the validation statutes apply.

But the *Walters* court did not rely solely on its statement of public policy as the rationale of its decision. Instead, the court focused, as we do here, on whether the loan guarantees were critical to the debt financing of the county's waste disposal system. The court said: "We feel that the possibility of future litigation [over the county's loan guarantees] is very likely to have *a chilling effect upon potential third party lenders, thus resulting in higher interest rates or even the total denial of credit*, either of which might well impair the county's ability to maintain an adequate waste disposal program. Accordingly, we hold that [the validation statutes] are applicable . . . ." (*Walters*, *supra*, 61 Cal.App.3d at p. 468, italics added.) In short, the loan guarantees were subject to validation because the debt financing of the county's waste disposal operation depended on

27

those guarantees, not merely because the absence of validation might somehow impair the county's operations. (See *Kaatz v. City of Seaside, supra,* 143 Cal.App.4th at p. 44 ["while having a prompt validating procedure to permit a public agency to operate without impairment may be a significant rationale for the validation statutes' application to agency action as provided in the statutes . . . , *this rationale should not be transformed into a test for determining the type of agency action encompassed by Government Code section 53511*" (italics added)].)

The decision in *Friedland, supra,* 62 Cal.App.4th 835 is to the same effect. In *Friedland,* a series of local agency agreements were held to be "contracts" for purposes of section 53511 — and therefore subject to the validation statutes — because they involved agency guarantees of a debt obligation incurred by an independent public benefit corporation that was building an aquarium. (*Friedland,* at pp. 838–840.) The public benefit corporation anticipated paying off the debt from the aquarium's operating revenues, but to make the bonds less risky, several local agencies provided security in the event the aquarium revenues proved insufficient, and without that security, the financing of the project would have been in jeopardy. (*Id.* at p. 838.) Because the contracts guaranteeing the debt obligation were critical to the successful debt financing of the aquarium project, the Court of Appeal held that section 53511 applied and that the contracts were subject to the validation statutes. (*Friedland,* at p. 845.)

Both *Walters* and *Friedland* stand for the proposition that a local agency's guarantee of a debt incurred by some other entity falls within section 53511's use of the term "contract[]" if the guarantee is necessary to secure the debt financing of a project that benefits the local agency. But that circumstance is

not present here. As explained, payment of the debt service on the District's bonds does not depend on the lease-leaseback arrangement now under review. As for the District's broader reading of *Walters* and *Friedland*, under which the validation statutes apply whenever litigation over a contract might somehow impair agency operations (see *Walters, supra,* 61 Cal.App.3d at p. 468; *Friedland, supra,* 62 Cal.App.4th at p. 843), nothing in the text of section 53511 supports that broad rule, and no case has adopted it as the basis of its decision. (See *Kaatz v. City of Seaside, supra,* 143 Cal.App.4th at pp. 43–44 [rejecting the broad reading of *Walters* and *Friedland*].)

Third, defendants argue that whenever proceeds from the sale of public agency bonds fund an agency contract, federal tax law creates the necessary degree of interdependence between the contract and government indebtedness, thus bringing the contract within the scope of section 53511. Defendants point out that local government bonds offer federal tax benefits to bondholders, meaning in practice that the issuing agency pays a lower interest rate than it would otherwise have to pay. In order to qualify for those federal tax benefits, however, the issuing agency cannot arbitrage the proceeds of the bond sale (i.e., invest the proceeds at a rate that exceeds the rate the agency is paying on the bonds). (See 26 U.S.C. § 148.) An exception is made for temporary investments of bond sale proceeds, but this exception "applies only if the issuer reasonably expects to satisfy the expenditure test, the time test, and the due diligence test." (26 C.F.R. § 1.148-2(e)(2)(i) (2023).)[9]

---

[9] These tests require (1) that 85 percent of the net sale proceeds be allocated for expenditure within three years of the

Defendants argue that protracted litigation over a lease-leaseback arrangement like the one at issue here might lead to delay that would cause a school district to invest its bond sale proceeds for a longer period than the temporary period permissible under federal tax law, thus calling into question the tax-exempt status of its bonds. In defendants' view, the mere possibility of this occurrence will make the bonds less marketable, and therefore the marketability of its bonds is inextricably bound up with the validity of the lease-leaseback arrangement.

In evaluating defendants' argument, we first note that under federal tax law, an issuing agency need not actually meet the requirements of the expenditure, time, and due diligence tests so long as it *reasonably expects* to do so. (See 26 C.F.R. § 1.148-2(b)(1) (2023) ["the determination of whether an issue consists of arbitrage bonds under section 148(a) is based on the issuer's *reasonable expectations* as of the issue date regarding the amount and use of the gross proceeds of the issue" (italics added)]; see also *Weiss v. S.E.C.* (D.C. Cir. 2006) 468 F.3d 849, 851 (*Weiss*).) Hence, practically speaking, the tax-exempt status of the issuing agency's bonds would not be in jeopardy so long as the agency reasonably expected to satisfy the federal tax law requirements when it issued the bonds and thereafter proceeded in good faith. Moreover, if delays ever occur due to circumstances beyond a local agency's control, the agency can

_____

issue date (the expenditure test), (2) that the issuer enter into a binding obligation within six months of the issue date to expend five percent of the net sale proceeds (the time test), and (3) that the issuer proceed with due diligence toward completion of the project (the due diligence test). (See 26 C.F.R. § 1.148-2(e)(2)(i) (2023).)

simply withdraw the bond sale proceeds from high-yielding investments, and it can rebate any arbitrage profit to the federal government, thus maintaining the tax-exempt status of its bonds. (See 26 U.S.C. § 148(f).)[10] Therefore, there was no real risk that delays in the construction project at issue here would affect the tax-exempt status of the District's bonds.

It is true, of course, that when a bond-funded project is delayed, a public agency will have to forgo income from high-profit investments of the bond proceeds. However, that contingency is one among many that might affect the overall cost of a capital improvement project, and it is unlikely to discourage bond purchasers who, regardless of unexpected increases in project costs, will be paid using receipts from levies of ad valorem property taxes.

The District also relies on the facts of *Weiss*, *supra*, 468 F.3d 849,[11] which, according to the District, demonstrate that taxpayer litigation, and the delays occasioned thereby, can sometimes alter the federal tax-exempt status of municipal

---

[10] In its "Certificate as to Arbitrage," the District averred that it would comply with federal tax law regardless of any delay of its planned construction projects. It said: "Proceeds of the Bonds and interest earnings and gains thereon, if any, remaining in the Building Funds following the 3-year Temporary Period will be invested at a yield not in excess of the yield of the Bonds . . . *or yield reduction payments under Section 148 of the Internal Revenue Code of 1986, as amended . . . , will be made to the federal government with respect to such investment after the end of the 3-year Temporary Period.*" (Italics added.)

[11] The District relies on the facts rather than the *holding* of *Weiss* because *Weiss* concerned an issue different than the one before us.

bonds. To obtain a fuller statement of *Weiss*'s facts, the District urges us to consider the Security and Exchange Commission's "Initial Decision" in that case. (See *In the Matter of Ira Weiss and L. Andrew Shupe II* (Feb. 25, 2005) S.E.C. Initial Dec. No. 275 <https://www.sec.gov/litigation/aljdec/id275lam.htm> [as of April 27, 2023], all internet citations in this opinion are archived by year, docket number, and case name at http://courts.ca.gov/38324.htm.)

The facts of *Weiss*, in our view, have no purchase on the issue we confront here. In *Weiss*, a school district in Pennsylvania issued bonds for the purpose of constructing specified improvements to school facilities within the district, but after investing the bond sale proceeds at a profit, the school district board did not proceed in good faith. Instead, the board became distracted by an array of issues, including the decision to replace a popular football coach, the hiring of a new superintendent, the dismissals of two employees, a lawsuit brought by a student accused of cheating, the hiring of various principals and school administrators, and the cancer illness of a board member. As a result of these distractions, the school district failed to proceed with the planned construction project, although it continued to earn a profit from its investment of the bond sale proceeds. Hence, the Internal Revenue Service determined that the school district had issued taxable arbitrage bonds. (See *In the Matter of Ira Weiss and L. Andrew Shupe II*, *supra*, S.E.C. Initial Dec. No. 275.)

We see little in the facts of *Weiss* that supports the argument defendants make here. Those facts merely demonstrate that after a school district has issued school construction bonds, its deliberate failure to proceed with the construction project, despite investing the bond sale proceeds at

a profit, can cause the bonds to lose their tax-exempt status. (See 26 C.F.R. § 1.148-2(c) (2023).)  In *Weiss*, one (among many) of the events that distracted the Pennsylvania school district was a lawsuit, but the lawsuit had nothing to do with the planned construction project, nor did the lawsuit require a delay in that construction.  Thus, the facts of *Weiss* do not support the broad rule advanced by the District here, that litigation over a bond-financed school construction project, forcing delays that are beyond the school district's control, can cause the bonds to lose their tax-exempt status despite the good faith efforts of the school district to proceed with the project and despite the timely rebate to the federal government of any improper arbitrage profits.

The District also argues that bond counsel will not be able to render an unqualified opinion regarding the tax-exempt status of a public agency bond issue if there is the possibility that litigation might delay the planned construction project. There are two answers to this argument.  First, the bonds that were used to finance the present project were sold nearly a year before the lease-leaseback arrangement was even executed, and bond counsel was nonetheless able to render an opinion regarding the tax-exempt status of the bonds.  Therefore, the possibility of future litigation over projects that the bonds would finance was apparently not a concern to bond counsel.  Second, the possibility of litigation-related delays exists with respect to virtually every bond-funded public agency project, and as discussed, federal tax law can be satisfied despite such delays. (See, e.g., 26 U.S.C. § 148(f) [permitting rebates to the federal government].)  Hence, the District's argument proves too much. Under the District's argument, virtually any contract that is funded by the proceeds of a public agency bond sale would come

within the validation statutes. As discussed, that rule stretches section 53511 too far.

Fourth, the District argues that the Court of Appeal's holding in *McLeod, supra*, 158 Cal.App.4th 1156 supports its contention that the validation statutes apply to the lease-leaseback arrangement at issue here. *McLeod*, however, is readily distinguished. *McLeod* involved a challenge to a school district's decision to issue bonds for a purpose different from the purpose presented to the voters when the voters approved the bonds. The ability of the school district to finance its planned construction project directly depended on the validity of that disputed decision. Indeed, the school district in *McLeod* asserted — without disagreement from the plaintiffs — that " 'every single day that this case has not been decided . . . impairs the ability of the District to go to the bond markets and get the funding to complete the [high school] construction.' " (*McLeod, supra*, 158 Cal.App.4th at p. 1169.) Not so here. Plaintiff is not challenging the validity of the District's decision to issue the bonds that funded the construction project at issue here. Rather, plaintiff is challenging the District's use of a section 17406 lease-leaseback arrangement where the lease-leaseback arrangement does not involve a long-term lease and where the construction project is independently financed from a bond sale that the District has already completed. *McLeod* is simply not on point.

Fifth, defendants cite *McGee, supra*, 49 Cal.App.5th 814, in which the Court of Appeal addressed the precise question we are deciding, concluding that where a lease-leaseback arrangement is independently financed through the issuance of district bonds, the bonds are inextricably bound up with the validity of the lease-leaseback arrangement, and therefore the

lease-leaseback arrangement is subject to the validation statutes. In our view, *McGee* did not meaningfully consider the nature of the relationship between the school district's bond financing and the agreement in question in that case. Therefore, we disapprove *McGee v. Torrance Unified School Dist.*, *supra*, 49 Cal.App.5th 814 insofar as it addresses the precise issue we decide here. We express no opinion regarding the other issues decided by the court in that case.

Finally, the Contractor makes a policy argument that is unrelated to the text of section 53511. The Contractor correctly notes that education has a special status in California, and the Contractor emphasizes the particular need school districts have for quick validation of lease-leaseback arrangements like the one here, thus protecting such arrangements from attacks brought by disgruntled contractors who were not selected for the project. The Contractor further warns that because of the holdings of *Davis I* and *Davis II*, school districts are already abandoning lease-leaseback arrangements like the one at issue here (i.e., ones that are independently financed), and they will continue to do so. To demonstrate the scope of this issue, the Contractor quotes the amicus curiae letter of the Long Beach Unified School District. That letter states: "The Long Beach Unified School District is the fourth largest public K–12 school district in the state . . . . [¶] The Long Beach Unified School District is currently executing approximately $3.0B in campus improvement projects approved and funded by local general obligations bonds. . . . The District considers the Lease-Leaseback delivery model to be a valuable method to bring timely & cost effective projects to our students."

The Contractor's arguments raise legitimate and weighty policy concerns to which we are not unsympathetic. Yet,

whether the people of the state are best served by a method of school construction that avoids competitive bidding, favors long-term partnering relationships with contractors, and allows for quick validation of construction deals, insulating such deals from subsequent attack, or whether, by contrast, the people are best served by a method of school construction that favors price competition among contractors and avoids favoritism, is a policy question best left to the Legislature. The legal issue before us is the scope of the term "contracts" in section 53511, and for the reasons explained, that term does not in our view include lease-leaseback arrangements like the one at issue here.

## IV. CONCLUSION

Because section 53511 is the only theory defendants relied on below for asserting that plaintiff was obligated to bring his present challenge as a validation action and because the lease-leaseback arrangement at issue here is not a "contract[]" for purposes of section 53511, we agree with the Court of Appeal that the validation statutes do not apply. The Court of Appeal also concluded that plaintiff's first amended complaint adequately alleged a taxpayer action under Code of Civil Procedure section 526a, and we did not grant review to consider that aspect of the court's decision, therefore the litigation can proceed based on that theory of standing. We affirm the judgment of the Court of Appeal and remand the matter to that court for further proceedings consistent with this opinion.

**JENKINS, J.**


**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**EVANS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Davis v. Fresno Unified School District

_____

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 57 Cal.App.5th 911
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S266344
**Date Filed:** April 27, 2023

_____

**Court:**  Superior
**County:**  Fresno
**Judge:**  Kimberly A. Gaab

_____

**Counsel:**

Carlin Law Group and Kevin R. Carlin for Plaintiff and Appellant.

Briggs Law Corporation, Cory J. Briggs and Janna M. Ferraro for California Association of Bond Oversight Committees as Amicus Curiae on behalf of Plaintiff and Appellant.

Jonathan M. Coupal, Timothy A. Bittle and Laura E. Dougherty for Howard Jarvis Taxpayers Foundation as Amicus Curiae on behalf of Plaintiff and Appellant.

Lang Richert & Patch, Mark L. Creede, Stan D. Blyth; Jones Hall and Charles F. Adams for Defendant and Respondent Fresno Unified School District.

Fagen Friedman & Fulfrost, James Traber, Linna Loangkote; Robert J. Tuerck and D. Michael Ambrose for California School Boards Association's Education Legal Alliance as Amicus Curiae on behalf of Defendant and Respondent Fresno Unified School District.

Leone & Alberts, Louis A. Leone and Seth L. Gordon for Statewide Educational Wrap Up Program as Amicus Curiae on behalf of Defendant and Respondent Fresno Unified School District.

Tao Rossini and Martin A. Hom for Coalition for Adequate School Housing, Association of California Construction Managers and Torrance Unified School District as Amici Curiae on behalf of Defendant and Respondent Fresno Unified School District.

Whitney Thompson & Jeffcoach, Timothy L. Thompson, Mandy L. Jeffcoach; Moskovitz Appellate Team, Myron Moskovitz; Baker Manock & Jensen and Jerry H. Mann for Defendant and Respondent Harris Construction Company, Inc.

Colantuono, Highsmith & Whatley, Michael G. Colantuono, Matthew C. Slentz and Conor W. Harkins for League of California Cities and California Special Districts Association as Amici Curiae on behalf of Defendants and Respondents.

Lozano Smith, Harold M. Freiman and Arne B. Sandberg for California Association of School Business Officials as Amicus Curiae on behalf of Defendants and Respondents.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Kevin R. Carlin
Carlin Law Group, APC
4452 Park Boulevard, Suite 310
San Diego, CA 92116
(619) 615-5325

Mark L. Creede
Lang, Richert & Patch
P.O. Box 40012
Fresno, CA 93755
(559) 228-6700

Myron Moskovitz
Moskovitz Appellate Team
90 Crocker Avenue
Piedmont, CA 94611
(510) 384-0354